**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MICHAEL J. MUSKOPF, derivatively on behalf of THE ESTÉE LAUDER COMPANIES INC.,

Plaintiff,

v.

WILLIAM P. LAUDER, CHARLENE BARSHEFSKY, STEPHANE DE LA FAVERIE, PAUL J. FRIBOURG, JENNIFER HYMAN, GARY M. LAUDER, JANE LAUDER, ARTURO NUNEZ, BARRY S. STERNLICHT, JENNIFER TEJADA, RICHARD P. ZANNINO, FABRIZIO FREDA, and TRACEY T. TRAVIS,

Defendants,

and

THE ESTÉE LAUDER COMPANIES INC.

Nominal Defendant,

Case No. 1:26-cv-06961

**DEMAND FOR JURY TRIAL**

Plaintiff Michael J. Muskopf ("Plaintiff"), by and through his undersigned attorneys, brings this stockholder derivative complaint for the benefit of nominal defendant The Estée Lauder Companies Inc. ("Lauder" or the "Company"), against current and/or former members of its Board of Directors (the "Board") and certain of its current and/or former executive officers (the "Individual Defendants", defined herein), seeking to remedy the Individual Defendants' breaches of fiduciary duties, violations of the federal securities laws, and other misconduct that has resulted in material damage to the Company and its stockholders. Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, such as filings by Lauder with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, including the federal securities fraud class action captioned *In re The Estée Lauder Companies Inc. Sec. Litig.,* Case No. 1:23-cv-10669-AS (S.D.N.Y.) (the "Securities Action"), and other matters of public record.

## I. INTRODUCTION

1. This is a stockholder derivative action brought for the benefit of nominal defendant Lauder against the Individual Defendants, all of whom are current and/or former officers and directors of Lauder, based on non-exculpable breaches of fiduciary duty and other serious misconduct which occurred between approximately February 2022 and October 2023 (the "Relevant Period"), as alleged in detail herein.

2. This derivative action further arises from the Board's breaches of its fiduciary duties by failing to diligently investigate in response to Plaintiff's pre-suit litigation demand (the "Litigation Demand") and/or complete an investigation within a reasonable time period. The Litigation Demand was issued to the Board by Plaintiff pursuant to Delaware law on January 23,

2025, over a year and a half ago. A true and correct copy of the Plaintiff's Litigation Demand is attached hereto at Exhibit A.

3. For years, Lauder—one of the world's leading prestige beauty companies—assured stockholders that sales growth within its critical Asia travel retail segment was driven by sustainable underlying demand for the Company's products and the strength of its brand. In reality, Lauder had been supplying and growing dependent on a pervasive, prohibited gray market resale industry in China and South Korea, called *daigou*,[1] to drive sales within its Asia travel retail segment—an unsustainable practice that was concealed from stockholders.

4. Critically, in 2019, Lauder publicly denied its use of *daigou* to inflate sales, citing Company policies and purchasing quotas at retail locations designed to "limit any risk of gray market around the world." Nevertheless, Lauder's pressure to grow led it to become reliant on the *daigou* resale pipeline as it pumped massive amounts product into the gray market via its travel retail channels. Indeed, according to detailed confidential witness accounts provided by multiple former Lauder employees in connection with the Securities Action,[2] the Company was using *daigou* to offload product during the COVID-19 pandemic when sales were slumping. For a time, Lauder's surreptitious use of the *daigou* gray market had its intended effect and allowed the Company to report surprisingly strong travel retail sales given a global pandemic.

---

[1] *Daigou* directly translates from its Chinese origin to English as "buy on behalf of." *Daigou* are resellers that purchase luxury goods at reduced, duty-free prices and resell them to end-consumers in mainland China at a price below retail but high enough to profit.

[2] The operative complaint in the Securities Action (the "Securities Complaint"), brought on behalf of a class of investors who purchased or acquired Lauder shares from February 3, 2022 through October 31, 2023 (the "Class Period"), was filed on March 22, 2024. All confidential witness accounts referenced herein appear in the Securities Complaint. As discussed further herein, the defendants' motion to dismiss the Securities Complaint would be denied ***in its entirety*** on March 31, 2025 -- shortly after Plaintiff issued the Litigation Demand to the Board -- and the Securities Action parties subsequently agreed in 2026 to a proposed ***$210 million*** settlement, which remains pending.

5. However, Lauder's ability to rely on *daigou* to prop up sales figures inevitably came to an abrupt end. First, on July 1, 2021, Lauder's largest customer, China Duty Free Group Company Limited ("CDFG")—the number one travel retailer in China, which generated ***14%*** of Lauder's net sales—pledged to eradicate all *daigou* activity. Then, on January 1, 2022, Chinese regulators implemented severe crackdowns on all *daigou* activity, effectively putting an end to Lauder's ability to rely on the gray market as a revenue stream. At the start of the Relevant Period, on February 3, 2022, the Individual Defendants, including defendant Fabrizio Freda ("Freda"), the Company's then-President and Chief Executive Officer ("CEO"), and defendant Tracey T. Travis ("Travis"), the Company's then-Executive Vice President ("EVP") and Chief Financial Officer ("CFO"), misleadingly touted Lauder's second quarter financial results, which captured activity from October 1, 2021 to December 31, 2021—prior to China's *daigou* crackdowns taking effect. The Individual Defendants touted "***[n]et sales increased in [Lauder's] travel retail business . . . reflecting continued strength of [Lauder's] brands with the Chinese consumer***," which falsely attributed sales revenue generated from illicit and unsustainable daigou to Lauder's brand strength.

6. After China's *daigou* crackdown took effect, however, Lauder's financial results rapidly declined and the Individual Defendants made a series of misrepresentations designed to convey a misleading picture of continued travel retail growth and demand. In doing so, the Individual Defendants concealed from stockholders the material effects that China's crackdown on *daigou* had on Lauder's *daigou*-dependent travel retail business. For example, on May 3, 2022, defendant Freda touted that the Company's "***confidence into Hainan['s] future is unchanged, actually increased***," concealing the fact that the actual source of Lauder's success in Hainan, China—the epicenter of travel retail in China—was *daigou* and that the Company's ability to generate the same level sales there had in fact changed negatively. As the Relevant Period

progressed, each quarter Lauder began issuing incrementally worse financial results related to its travel retail segment.

7. Rather than reveal the real reason for these poor results, the Individual Defendants misleadingly reassured stockholders of the temporary nature of disruptions to Lauder's now flailing travel retail sales. For example, on November 2, 2022, while omitting any reference to the *daigou* crackdowns, the Individual Defendants reported declining sales figures, claiming that any such softness in sales was simply a "***near-term temporary pause***" that did "***not diminish [Lauder's] deep conviction in Hainan for the long term***." Similarly, on May 3, 2023, the Individual Defendants again reassured stockholders that "***the challenges in travel retail are abated with time***." However, with Lauder's ability to rely on *daigou* sales gone for good and analysts asking questions about the reasons for the travel retail segment's inexplicable poor performance, the Individual Defendants were forced to finally admit on August 18, 2023, that "retail sales trends deteriorated and turned steeply negative following the enforcement actions to control *daigou* activity." Later, on November 1, 2023, the Individual Defendants disclosed that the travel retail sales downturn was "***primarily***" caused by government and retailer crackdowns on "***unstructured***" gray market activity. Stockholders were shocked. For example, on November 1, 2023, Jefferies Research reported that the Company's poor quarterly and full year financial outlook "both proved to be far worse than models" and as a result of the disclosures understood that the "*Daigou* portion was a meaningful part of the [travel retail business]." In response, Lauder's stock price lost close to ***half its value*** over the course of several disclosures falling from $206.76 per share on November 1, 2022 to $104.51 per share on November 1, 2023.

### A. Lauder's Asia Travel Retail Business

8. Lauder, a publicly traded Delaware corporation headquartered in New York City, is a leading prestige beauty company that manufactures, markets, and sells skincare, makeup,

fragrance, and hair care products worldwide. As of January 2024, Lauder held a 13.6% share of the global beauty market, making it the second largest beauty company in the world. Lauder distributes its products in approximately 150 countries and territories under many well-known luxury brand names. Some of the most recognizable brands in Lauder's luxury portfolio include Estée Lauder, La Mer, Origins, M·A·C, Le Labo, and Bobbi Brown.

9. Prestige beauty is an extremely competitive business. Discerning consumers drive sales. Accordingly, Lauder's commitment to preserving both its market position and public perception as a leader in the high-end prestige beauty space is crucial to its business. Lauder's commitment to its luxury brand image is clear from how the Company describes itself on its website: "We are Prestige Beauty. It's in our DNA."

10. The "channels" or venues through which Lauder distributes its products are critical to its sales and meant to align with Lauder's luxury brand image and price point. As Lauder explains in its SEC filings: "We sell our prestige products through distribution channels that complement the luxury image and prestige status of our brands . . . . We believe that our strategy of pursuing selective distribution heightens the aspirational quality of our brands." Accordingly, Lauder's traditional distribution channels include high-end department stores, upscale spas, and luxury e-commerce websites.

11. In recent years, travel retail has fast become one of Lauder's most important and profitable sales channels. Travel retail is comprised of duty-free shops, including those at airports or on cruise ships. Products sold in Lauder's travel retail channels are in high demand by international travelers because they are exempt from import and sales taxes. In 2021, travel retail accounted for 28% of Lauder's total revenue, which was a significant increase from 18% in 2018 and 6% in 2009. Indeed, by 2023, defendant Freda touted that travel retail accounted for "nearly a

third" of Lauder's overall business.

12. Lauder's travel retail channel is especially popular in certain Asian markets, notably China and South Korea. Lauder's website acknowledges that "Asian consumers are among the most discerning in the world—which bodes well for the prestige beauty category." Lauder's appeal in Asia is also due to large international price differentials on certain beauty products, the outsized demand for luxury beauty products in Asian countries, and the limited availability of certain brands in different countries. When coupled with international tax exemption and a massive consumer base, Lauder's duty-free travel retail channels in China[3] and South Korea[4] have become a critical source of revenues for Lauder and were therefore closely watched by the Company and investors. For example, on February 6, 2023, analysts at Credit Suisse detailed their expectation that Lauder's "travel retail revenues are poised to step-change higher very quickly and will continue to be a significant driver for several quarters."

13. The Individual Defendants also highlighted the specific importance of Lauder's China travel retail segment in the Company's Annual Reports on SEC Form 10-K for 2021 and 2022, which reported that the Company's single "largest customer . . . sells products primarily in China travel retail," and accounted for 14% of Lauder's consolidated net sales in 2021. Analysts determined that Lauder's "largest customer" during those periods was likely the world's number one travel retailer, CDFG. CDFG's parent company is China Tourism Group Duty Free

---

[3] According to Lauder's Annual Report on Form 10-K that was filed with the SEC during the Relevant Period on August 18, 2023, for Lauder's fiscal year ended June 30, 2023 (the 2023 10-K"), "net sales in mainland China, as well as net sales from travel retail locations, in fiscal 2023, 2022 and 2021 were approximately 28%, 34% and 36% of consolidated net sales, respectively."

[4] Also according to Lauder's 2023 10-K, in 2022 and 2023 "net sales in Korea, including net sales from travel retail locations, were approximately 10% and 11% respectively, and no other country represented greater than 10% of the Company's consolidated net sales."

Corporation Limited ("CTGDF"), a Chinese state-owned franchise company authorized by the State Council to carry out nationwide duty-free business in China.

### B. Asia Travel Retail's Basement Exchange: China's *Daigou* Gray Market

14. In China, growing travel retail channels gave rise to a backchannel gray market for luxury goods. Beginning around 2005, a clandestine gray market resale industry known as *daigou* emerged in certain Asian markets to serve end-consumers in mainland China. The *daigou* industry is a form of surrogate shopping whereby large quantities of goods are purchased, typically from duty-free stores in travel retail channels, and resold at a profit to end-consumers in local markets. The *daigou* gray market capitalizes on the scarcity and high import price of luxury goods in China, and profits from price arbitrage and tax exemptions unique to duty-free locations.[5]

15. Over the years, China has enacted regulations ensuring oversight of *daigou* entities. For example, on January 1, 2019, a new Chinese regulation took effect, called the E-Commerce Law of the People's Republic of China ("ECL"). The ECL obligates *daigou* enterprises to register and pay taxes, a requirement designed to remove *daigou's* ability to profit from tax exemptions. The measure was part of the Chinese government's ongoing effort to curtail gray market activity.

16. *Daigou* thrives in locations where these enterprises can efficiently purchase large quantities of luxury items at a lower, duty-free price for resale in mainland China. As corporate *daigou* enterprises expanded their underground resale networks, certain locations in Asia became purchasing hubs. Internationally, South Korea is a common hotspot for the *daigou* industry because of its proximity to mainland China and relatively favorable luxury goods pricing and duty-

---

[5] Modern "corporate" *daigou* now have vast digital resources to reach their end-consumers and have largely displaced earlier, individualized operations. Corporate *daigou* can distribute massive amounts of luxury goods through the gray market pipeline.

free policies.

17. Domestically, the Chinese island province of Hainan sits just twelve miles from the mainland and became a haven for the *daigou* industry due to a highly favorable duty-free policy that allows tourists to purchase luxury goods at lower prices compared to mainland China.[6] Moreover, because up to 90% of Chinese citizens do not have a passport, domestic travel is particularly popular in China. Though purchases for *daigou* gray market resale can and do occur in any travel retail location, these two geographic locales became critical to the *daigou* industry's ability to bulk purchase duty-free luxury goods for resale on the gray market in mainland China.

18. However, luxury brands that funnel products through the *daigou* gray market expose themselves to significant financial, legal, and reputational risk for the singular purpose of driving near-term, voluminous sales. For this reason, the *daigou* market is universally condemned by prestige beauty brands and their stockholders, who recognize that these gray markets can damage a brand's image and impede the ability to generate above-board sales through legitimate retail channels. For example, in 2022 and 2023, luxury behemoth and Lauder's competitor Louis Vuitton Moet & Hennessey SE ("LVMH") publicly described *daigou* as "basement" exchanges that are "dreadful" for luxury companies, emphasizing that "there is nothing worse" for prestige brand equity.

### C. Lauder Floods *Daigou* with Product to Achieve Sales Growth While Stockholders Are Told Lauder Never Benefits From the Gray Market

19. On February 5, 2019, defendant Freda addressed industry questions about the impact of *daigou* and China's recently enacted ECL on Lauder's business during the Company's

6 Established in 2011, the Hainan Offshore Duty-Free Policy ("Hainan Duty-Free Policy") allowed tourists to purchase up to $4,170.20 USD (30,000 RMB) worth of duty-free luxury goods per person.

2Q19 earnings call. Defendant Freda condemned the practice and denied the Company's reliance on gray market resale, assuring stockholders that Lauder was "***never benefiting from a lot of the daigou business because of [Lauder's] strict policies to avoid any phenomenon like this***." Defendant Freda also told stockholders Lauder would continue to enforce its internal purchasing quota policies in its travel retail channels "***to limit any risk of gray market around the world***."

20. Despite the Individual Defendants' public representations to the contrary, Lauder did the opposite and diverted massive amounts of product into the gray market resale pipeline to drive lagging sales. Indeed, Lauder became dependent on *daigou* to make its numbers during the COVID-19 pandemic, when the amount of international travel had dramatically decreased.

21. In mid-2020, during the height of the pandemic, looser duty-free regulations implemented in China presented an opportunity for Lauder to drive sales through the *daigou* gray market. Specifically, on July 1, 2020, China's Hainan Island increased its duty-free spending limits. Purchasers in Hainan could now acquire up to $13,900.67 USD (100,000 RMB) worth of duty-free goods, causing *daigou* sales to proliferate.

22. Lauder capitalized on these loosened regulations in Hainan by supplying massive shipments of products to its travel retail channels to generate sales through the *daigou* gray market. The detailed confidential witness accounts of former Lauder employees in the Securities Complaint confirmed that the Company became reliant on *daigou* to grow sales in its travel retail business. The accounts of these former employees ("FEs")[7] in the Securities Complaint include detailed descriptions of how the Company's senior management drove travel retail growth through *daigou* gray market resale.

---

[7] In the Securities Complaint (and accordingly herein), all FEs are identified by number (FE-1, FE-2, etc.) and described in the feminine to protect their identities.

23. The confidential witness referred to in the Securities Complaint as "FE-2"[8] described travel retail as an area of Lauder's biggest growth, going "way back." The confidential witness referred to in the Securities Complaint as "FE-3"[9] explained that China and particularly Hainan were "huge markets." The confidential witness referred to in the Securities Complaint as "FE-1"[10] recalled that there was a shift from South Korea to China in the travel retail space during 2020 when the new regulations increased purchasing limits in Hainan. Additionally, FE-2 recalled that Lauder sometimes asked its brand teams to do what it could to including moving launches to be first to market, change promotional calendars or accelerate new distribution. FE-1 recalled that large purchases made during the pandemic, from 2020 through her tenure at Lauder, were "almost definitely" made by *daigou*.

[8] The Securities Complaint states that FE-2 worked for Lauder for more than ten years ending in mid-2021. Prior to her most recent role, FE-2 held the position of Senior Vice President in the finance part of the organization for one of Lauder's regions. This role included overseeing demand planning and store replenishment functions for Lauder. In this role, FE-2 is alleged to have attended monthly demand planning and financial review meetings for her region. From 2019 to 2021, FE-2 worked for Lauder on special projects to improve various aspects of Lauder's business planning capabilities, including supply chain, demand planning, and financial planning.

[9] The Securities Complaint states that FE-3 was employed by Lauder in a variety of roles for several years before the Class Period through early 2023. FE-3 was most recently employed in a Senior Leadership position in Travel Retail EM[E]A. FE-3 is alleged to have attended monthly meetings with the members of the leadership team for EMEA, where the General Manager for the region provided information from another monthly meeting that occurred between Worldwide leadership attended by the Global President TR WW and the regional general managers.

[10] The Securities Complaint states that FE-1 worked for Lauder from July 2022 to January 2023 as a Regional Marketing Director of Travel Retail for the Asia-Pacific ("APAC") region, La Mer | Le Labo. FE-1 worked closely with the General Manager for the Lauder brands for which she was responsible, La Mer and Le Labo. FE-1 also is alleged to have attended regular sales meetings, composed "action plans" for her department, and participated in monthly meetings with Lauder brand General Managers and Vice Presidents and Presidents of Travel Retail APAC, along with relevant employees from the sales and marketing teams. FE-1 was also responsible for managing the marketing calendar, which included budget management for new product launches, working closely with the commercial sales teams and demand planning and forecasting. Further, FE-1 was also responsible for promotions, some aspects of pricing, and public relations work. Prior to working for Lauder, FE 1 worked in travel retail APAC for her previous employer.

24. According to the Securities Complaint, FE-1 continued to say that companies could control the *daigou* market by limiting the supply of goods provided to duty-free locations, but preferred to sell more product, which came at the risk of "flooding the market." Similarly, FE-3 further explained that the movement of product into *daigou* channels was "activated" through retailers, such as China Duty Free Group and that Lauder utilized "incentives" in order to facilitate that movement. FE-1 described Lauder as being "much looser" when it came to "loading" retailers with stock in comparison to its competitors, such as L'Oréal. FE-1 explained that Lauder "took a lot of market share" during the pandemic and that this was "very telling" because *daigou* were the only people buying product at that time. FE-1 commented that while Lauder's increased market share was "nice on paper," Lauder's gains in its market share came from *daigou* business. FE-1 continued to say that Lauder is now seeing the "repercussions" from the reliance on *daigou* during this period. FE-1 described the data surrounding Lauder's jump in market share as "very jarring." FE-2 remarked that it was hard to reconcile the growth of travel retail in China with the lockdowns and lack of travel, stating that it did not make sense and that the growth was "counterintuitive."

25. Per the Securities Complaint, FE-3 stated that if there were issues with overstocks that Lauder would "bulk ship" to places like Korea, where it was known that a *daigou* market existed, to cover losses. According to FE-3, the Company would "switch on the *daigou* market if needed," including sending "popular" products into these channels. FE-3 added that "popular" product was frequently held back from Europe in order to send to APAC.

26. Further, the Securities Complaint alleges per the accounts of the FEs that it was known internally at the Company, including by defendants Freda and Travis, that the product Lauder fed into its travel retail channels entered the *daigou* gray market. For example, FE-2 confirmed that Lauder's executive leadership knew about the *daigou* reselling practice. FE-2

confirmed that the Company and its leadership could see sales spikes which were attributed to *daigou* practices. FE-2 confirmed that Lauder had "clear visibility" in its sales because the Company had very detailed sell-through and sales reporting information from its retail partners.

27. According to the Securities Complaint, FE-2 noted that Lauder held monthly and sometimes weekly demand planning meetings, which were "brutal" with abuse. FE-2 further noted that there was plenty of information available at these meetings to "triangulate" the correct sources of the sales, including the impact of the *daigou* or gray market sales. FE-2 further added that "everyone" knew the price differentials based on the pricing database. FE-2 explained that the pricing database was updated fairly regularly, and the tool used for the database was called Anaplan. FE-2 recalled that there was a team of about 5-10 people working on it, and that the head of that team became Chief of Staff for defendant Travis. FE-2 described how the database was used to track exchange rates and other differentials between brands and regions. The database, FE-2 continued, was used to prepare slide decks and reports which were presented to the Company's senior executives, including defendant Freda, who were briefed on these pricing differentials.

28. According to the account in the Securities Complaint of FE-3, there was a whole team involved in the process led by the Company's former Global President Travel Retail, Israel Assa ("Mr. Assa").[11] FE-3 explained that there was a team that was a part of travel retail APAC that specifically analyzed the *daigou* market. According to FE-3, there was a "huge" amount of people on the Commercial Team in Singapore, the head office for APAC, that reported into Global Travel Retail and whose responsibilities included analyzing the *daigou* market.

29. Per the Securities Complaint, FE-3 continued to say that the movement of product into *daigou* channels was "overseen," "approved," and "activated" by Mr. Assa. FE-3 explained

[11] Mr. Assa departed the Company in December 2024.

that "everything, absolutely everything" was approved by Mr. Assa and that he had influence over the process while occupying his prior role as President, Commercial Estée Lauder Travel Retail Worldwide. According to FE-3, Mr. Assa was also responsible for allocating product to the various regions and that *daigou* was taken into account when making these decisions.

30. Importantly, as alleged in the Securities Complaint based on the FE accounts, it was known internally, including by defendants Freda and Travis, that Lauder's products were being sold into the *daigou* gray market because there was a system in place to track the final locations where the Company's high-end products were sold. For example, FE-2 explained that Lauder used "pincodes" for certain products to know if those products were going someplace where they were not supposed to be. FE-2 further confirmed that if a product was pincoded, Lauder had the ability to see where the product ended up. Similarly, FE-1 explained that all products had tracking codes in order to exercise "market control."

### D. China Cracks Down on *Daigou* While the Impact on Lauder's Travel Retail Sales Is Concealed From Stockholders

31. As the COVID-19 pandemic abated, Chinese authorities began enacting policies to crack down on *daigou* in China due to the negative tax implications of the practice. Meanwhile, Lauder's travel retail sales remained inflated as a result of its over dependence on *daigou* gray market resale.

32. On July 1, 2021, travel retail titan and Lauder's largest customer, CDFG, held a pin to the Company's ballooning sales when it publicly pledged to eradicate *daigou* gray market resale in Hainan. That day, CDFG announced that "it is necessary to maintain the healthy ecology of the offshore duty-free industry, severely cracking down on purchasing agents and preventing market risks."

33. Then, on December 7, 2021, the Chinese government publicly announced that

regulations aimed at cracking down on *daigou* activity would take effect in the new year. Chinese policy commentators quickly noted that "[t]he promulgation of this law shows the determination of the Hainan provincial government and the Chinese government to resolutely crack down on illegal *daigou* and smuggling."

34. Formal regulations enforcing this policy and cracking down on *daigou* took effect on January 1, 2022. By this time, as alleged in the Securities Complaint based on the detailed FE accounts, it was known internally at Lauder that the Company could no longer depend on this unsustainable sales practice to drive sales growth and that the Company's critical travel retail business segment would be unable to maintain prior levels of *daigou*-inflated sales. Meanwhile, stockholders were kept in the dark as to the threat posed to Lauder's travel retail business because the Individual Defendants repeatedly assured them in their public statements that the Company condemned *daigou* and was not in the business of selling into the gray market.

### E. The Individual Defendants Attribute Travel Retail Sales Increases to Lauder's Brand Strength, Despite Knowing *Daigou* Resale Was the True Driver

35. Beginning in February 2022, the Individual Defendants made a series of misrepresentations and omissions to stockholders about the cause of Lauder's sales success in its Asia travel retail business. On February 3, 2022, the Individual Defendants caused Lauder to report its 2Q22 financial results, which captured a three-month period from October 1, 2021 to December 31, 2021. The same day, the Individual Defendants caused Lauder to issue a press release and hold an earnings conference call. Critically, the time frame reflected in Lauder's February 3, 2022 financial results was prior to China's January 1, 2022 regulations cracking down on *daigou*, when Lauder was generating sales growth from and dependent on *daigou* gray market resale.

36. The Individual Defendants touted the Company's net sales increases in travel retail and misleadingly attributed the reported sales growth to sustainable, market-driven factors,

such as the "strength" of Lauder's brand. In doing so, the Individual Defendants misled stockholders by failing to disclose that the Company had been relying on unsustainable sales practices — namely, inundating the *daigou* gray market with product supply — to drive its sales growth. Specifically, in the Company's 2Q22 10-Q, the Individual Defendants boasted that "***[n]et sales increased in our travel retail business . . . reflecting continued strength of our brands with the Chinese consumer***." However, this statement misled stockholders to believe that Lauder's net sales increased in travel retail because its brand equity was strong with Chinese consumers while concealing the reality that Lauder's net sales increase was due to *daigou*.

### F. The Individual Defendants Tout an "Unchanged" Landscape in Hainan, Despite China's Regulatory Crackdowns on *Daigou* Taking Effect

37. By the time the Individual Defendants reported Lauder's financial results for 3Q22, China's government crackdowns on *daigou* activity had taken effect. On May 3, 2022, during Lauder's 3Q22 Earnings Call, the Individual Defendants continued to misrepresent to stockholders that "***confidence into Hainan['s] future is unchanged, actually increased***." However, this statement was false and misleading because it represented an "***unchanged***" landscape in Hainan despite China's severe regulatory crackdowns on *daigou* having materially altered Lauder's ability to maintain its travel retail sales growth. Moreover, because the Company had become heavily dependent on the *daigou* gray market to generate sales growth within its travel retail segment, the Individual Defendants' statements omitted material information that the Company could not sustain its sales figures as a result of no longer being able to rely on this illegitimate backchannel to drive growth.[12]

[12] In 2022, late-stage COVID-19 variant surges caused episodic governmental lockdowns in parts of China, including Shanghai in February 2022 and Hainan in August 2022. Though these surges caused a wave of disruption, China's governmental lockdowns had the parallel effect of further obscuring the impact of the Hainan *daigou* crackdown on Lauder's travel retail business.

38. Likewise, on August 18, 2022, during Lauder's 4Q22 Earnings Call, defendant Freda stated that "***the power of Hainan in the future remain[s] intact***." Defendant Freda's statement again gave stockholders the misimpression of an unchanged market in Hainan, when in reality, Lauder had lost its ability to divert massive quantities of product to the *daigou* market to shore up its sales figures. However, as the Relevant Period progressed, Lauder could not stem the tide of the *daigou* regulatory crackdowns forever. Soon, the Individual Defendants' public statements touting the resilience of the Company's travel retail business were spliced with disclosures revealing declining net sales that, unbeknownst to stockholders, were the result of Lauder's inability to access the *daigou* gray market in the wake of China's 2022 regulatory crackdowns on the illicit resale practice.

### G. Lauder's Stock Price Drops as the Individual Defendants Reveal Only Partial Truths Explaining Poor Sales, While Offering False Reassurances to Stockholders

39. Eventually, the Individual Defendants were forced to begin revealing incrementally worse news of sales declines within the Company's travel retail business and the negative impact it was having on the Company's financial outlook. Specifically, on November 2, 2022, the Individual Defendants caused Lauder to issue a press release announcing financial results for its 1Q23. In the press release, the Individual Defendants reduced the full year outlook for FY 2023, which they claimed was done "primarily to reflect tighter inventory management in Asia travel retail, given reduced traffic as a result of COVID-19 restrictions." The market reacted accordingly, and Lauder's stock price dropped over 8%, a reduction of $16.80 per share, bringing the share price down to $189.96 at closing. Notwithstanding this disclosure, on November 2, 2022,

---

The Individual Defendants' statements amplified this obscurity, so as not to admit to dependence on *daigou* to prop up the Company's sales.

the Individual Defendants reassured stockholders that they "***anticipate[d] sequential acceleration . . . as these pressures begin to abate***." The Individual Defendants' reassurances were false and misleading because they failed to disclose that Lauder was no longer unable to tap into the *daigou* gray market sales that accounted for its prior travel retail growth and that such pressures were not going to abate with time.

40. As the Relevant Period continued, Lauder's stock price repeatedly dropped as the Individual Defendants revealed new information about the decline in travel retail sales. On February 2, 2023, the Individual Defendants again lowered the Company's outlook for FY 2023, due to the "disruption to travel and staffing levels in Hainan that slowed the expected normalization of inventory and the recently announced potential roll-back of COVID-related supportive measures in Korea duty free." In response to this news, shares of Lauder's common stock declined by nearly 4.5%, a reduction of $12.39 per share, bringing the share price down to $268.41 on February 2, 2023. That same day, the Individual Defendants nonetheless continued to mislead stockholders when they assured stockholders that the Company was "***sitting on a decent amount of inventory . . . to supply the sales that we expect to see in the fourth quarter***." However, the Individual Defendants' reassurances were materially false and misleading because the Individual Defendants' rosy picture of the Company's inventory levels failed to disclose that Lauder could no longer rely on the *daigou* gray market to drive sales within its Asia travel retail segment.

41. Then, on May 3, 2023, the Individual Defendants again lowered Lauder's FY 2023 guidance because of the slow recovery in Asia travel retail markets. The Individual Defendants noted that as "the shape of recovery from the pandemic for Asia travel retail comes into better focus, it is proving to be both far more volatile than we expected and more gradual relative to what we experienced in other regions." The Individual Defendants cited COVID-19 recovery and

tightening inventory levels for the poor financial results. As a result of these revelations, Lauder's common stock declined by over 17%, a reduction of $42.52 per share, bringing the share price down to $202.70 on May 3, 2023. The Individual Defendants again continued to reassure stockholders that sales would rebound despite knowing that the *daigou* sales spigot had been turned off. For instance, defendant Freda misleadingly claimed during Lauder's May 3, 2023 earnings call that: "[e]ncouragingly, retail sales performance is significantly ahead of organic sales results in Global travel retail, ***which gives us confidence that the challenges in*** travel retail are abated with time."

42. At this point, analysts at Deutsche Bank expressed concern about the Company's lowering of guidance for the third consecutive time stating: "the sheer magnitude of the reduced outlook and associated operating deleverage raises questions related to EL's capabilities vis-à-vis demand forecasting, visibility, and supply-chain agility in its most profitable geography and channel." The Individual Defendants' false and misleading narrative concerning Lauder's net sales decline in travel retail was becoming increasingly unbelievable as the truth emerged and the risk of Lauder's over dependence on the *daigou* gray market materialized.

### H. The Individual Defendants Admit the Company's Over Reliance on *Daigou* Was the Primary Driver of Lauder's Net Sales Decline in Travel Retail

43. On August 18, 2023, the Individual Defendants finally, explicitly admitted that the Company's travel retail "sales trends deteriorated and turned steeply negative from the enforcement actions to control *daigou* activity." As a result of these revelations, Lauder's common stock declined by over 3%, a reduction of $5.37 per share, bringing the share price down to $156.69 on August 18, 2023. Lauder's stock continued to fall on the next trading day, August 21, 2023, when it declined by more than an additional 3.5%, a total decline of nearly 7%.

44. However, the Individual Defendants continued to mislead stockholders by failing

to disclose that the loss of *daigou* sales were the primary cause of Lauder's declining sales. Indeed, the Individual Defendants continued to reassure stockholders that any negative effects from *daigou*-related enforcement actions were merely "***short term headwinds***." The Individual Defendants also described the sales declines as a "***timing issue that's having a big short-term temporary impact for us***." These reassurances were false and misleading because Lauder depended on *daigou* gray market resale to generate travel retail growth for many quarters, which could not be maintained in the wake of China's 2022 crackdowns. Further, the Individual Defendants' reassurances omitted the fact that the referenced "enforcement actions" were not isolated events but reflected the Chinese government's 2022 regulatory enactment to eradicate *daigou* for good, as endorsed by Lauder's largest customer.

45. The full truth was eventually revealed on November 1, 2023, when the Individual Defendants disclosed that Lauder's sales declines "primarily reflect a decline in our Asia travel retail business, primarily due to our and our retailers' actions to reset retailer inventory levels, and changes in government and retailer policies related to unstructured market activity, that led to lower product shipments compared to the prior-year period." This disclosure revealed to stockholders for the first time that the declining net sales that the Individual Defendants had been attributing for over a year to other causes was "***primarily***" due to and reflective of government and retailer crackdowns on "***unstructured market activity***"—*i.e.*, the *daigou* gray market. On this news, the price of Lauder common stock declined by $24.36, or nearly 19%, to close at $104.51 on November 1, 2023. *The Daily Telegraph* soon published an article describing how Lauder's stock "plunged to a six year low," citing that "[t]he company blamed 'changes in government and retailer policies related to unstructured market activity,'" which was understood to be China's "clamp down on *daigou* resellers[.]" Similarly, on November 1, 2023, Jefferies Research reported

that the Company's poor quarterly and full year financial outlook "both proved to be far worse than models" and understood that the "*Daigou* portion was a meaningful part of the [travel retail business]." Over the course of these disclosures, Lauder's stock price lost close to ***50%*** of its value.

### I. The Securities Action

46. Based on these events, the Securities Action was initiated against the Company in December 2023. The operative Securities Complaint would later be filed on March 22, 2024 on behalf of investors who purchased or acquired Lauder shares during the Class Period. The allegations in the Securities Complaint were based in part on the detailed confidential witness accounts provided by the FEs. The Securities Complaint asserted federal securities fraud claims against the Company and defendants Freda and Travis.

47. Following the filing of the Securities Complaint, the defendants to the Securities Action moved to dismiss. On March 31, 2025, however, U.S. District Judge Arun Subramanian ("Judge Subramanian") ***denied the defendants' motion to dismiss in its entirety***, notwithstanding the materially heightened pleading standards applicable in the Securities Action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

48. In denying defendants' motion to dismiss, Judge Subramanian concluded that the nine sets of defendants' public representations challenged in the Securities Complaint (made on February 3, 2022, May 3, 2022, June 2, 2022, August 18, 2022, November 2, 2022, February 2, 2023, May 3, 2023, and August 18, 2023) contained "actionable statements", including "***misleading omissions***", and were "***mired in half-truths***." In so finding, among other things, Judge Subramanian specifically credited the FE accounts and rejected the defendants' attempts to "discredit plaintiffs' allegations about three anonymous former employees." Further, Judge Subramanian concluded that the Securities Complaint sufficiently alleged scienter as to defendants Freda and Travis.

49. The Securities Action parties subsequently agreed in 2026 to a proposed ***$210 million*** settlement, which remains pending.

**J. <u>Plaintiff's Litigation Demand</u>**

50. On January 23, 2025, Plaintiff issued the Litigation Demand to the Board. *See* Ex. A. Therein, Plaintiff demanded that the Board undertake an independent, good faith investigation and take action on behalf of the Company against the Individual Defendants (identified in the Litigation Demand as "Management") and hold such individuals to account for the damages their fiduciary failures caused Lauder and/or exposed Lauder to.

51. Shortly after Plaintiff issued the Litigation Demand to the Board, the Securities Action was sustained in its entirety. Subsequently, the parties to the Securities Action agreed to a proposed ***$210 million*** settlement.

52. In response to a pre-suit demand, directors of a Delaware corporation must ***promptly*** investigate and evaluate the charges to discharge their duties to shareholders and manage corporate affairs responsibly. The directors must conduct an objective and thorough investigation. Directors are fiduciaries, and thus they are duty-bound to inform themselves properly before making business decisions.

53. Indeed, where a shareholder makes a pre-suit demand under Delaware law, the only issue subject to challenge is the good faith and reasonableness of the board's investigation. Although there is no prescribed procedure that a board must follow, and directors need not show that they performed a perfect investigation, the process must be sufficient for a court to conclude confidently that it reflects an earnest attempt to investigate a shareholder's complaint. Business judgment protection does not apply where a board's "review" of a demand effectively constitutes a pretext or sham.

54. Further, claims for relief belonging to the Company are, of course, valuable

corporate assets. Directors of Delaware corporations, such as Lauder, are duty-bound at all times to protect and preserve the corporation's assets.

55. For ***more than a year and a half*** since being served with the Litigation Demand, a period of time during which the Securities Action was sustained in its entirety notwithstanding the materially heightened PSLRA pleading standards, leading to a proposed $210 million settlement of the Securities Action, the Board has failed to investigate at all, or has otherwise failed to complete an investigation and respond to the Litigation Demand.

56. The Board's failure to complete an investigation after more than a year and a half into the serious allegations of wrongdoing in the Litigation Demand – allegations which supported a complete denial of defendants' motion to dismiss in the Securities Action, leading to a proposed $210 million settlement – amounts to a constructive, wrongful refusal of the Litigation Demand and the failure to protect and preserve the Company's corporate assets, in violation of the Board's fiduciary duties to Lauder and its stockholders.

57. Accordingly, this derivative action should proceed.

## II. JURISDICTION AND VENUE

58. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78j(b) and § 78u-4(f))

59. This Court also has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367(a) and Section 27 of the Exchange Act (15 U.S.C. §§ 78aa). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

60. In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the

United States mail, and the facilities of a national securities market.

61. This Court has personal jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

62. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) because nominal defendant Lauder is headquartered in this District and conducts business in this District. Further, a substantial portion of the acts and omissions alleged herein, including the issuance and dissemination of materially false and misleading information, occurred in this District. Additionally, Lauder's common stock trades on the New York Stock Exchange ("NYSE"), which is headquartered in New York.

## III. THE PARTIES

### A. Plaintiff

63. Plaintiff is a current shareholder of Lauder and has continuously held shares of Lauder common stock since 2018.

### B. Nominal Defendant

64. Nominal defendant Lauder is a Delaware corporation with its principal executive offices located in New York, New York. The Company's common stock trades on the NYSE exchange under the symbol "EL."

### C. The Individual Defendants

65. Defendant William P. Lauder ("W. Lauder") has served as a member of the Board since 1996 and currently serves as Chairman of the Board. Previously, defendant W. Lauder served as the Company's CEO from 2004 to 2009, and as its Executive Chairman from 2009 until

November 2024.

66. Defendant Charlene Barshefsky ("Barshefsky") has served as a member of the Board since 2001.

67. Defendant Stephane de La Faverie ("de La Faverie") has served as a member of the Board and as Lauder's President and CEO since January 2025. Defendant de La Faverie joined the Company in 2016 and served previously in various roles, including Executive Group President from September 2022 through December 2024.

68. Defendant Paul J. Fribourg ("Fribourg") has served as a member of the Board since 2006.

69. Defendant Jennifer Hyman ("Hyman") has served as a member of the Board since 2018.

70. Defendant Gary M. Lauder ("G. Lauder") has served as a member of the Board since 2023.

71. Defendant Jane Lauder ("J. Lauder") has served as a member of the Board since 2009. Defendant J. Lauder joined the Company in 1996 and served previously in various roles, including EVP, Enterprise Marketing and Chief Data Officer from 2020 through December 2024.

72. Defendant Arturo Nunez ("Nunez") has served as a member of the Board since 2022.

73. Defendant Barry S. Sternlicht ("Sternlicht") has served as a member of the Board since 2004.

74. Defendant Jennifer Tejada ("Tejada") has served as a member of the Board since 2018.

75. Defendant Richard F. Zannino ("Zannino") has served as a member of the Board

since 2010.

76. Defendant Freda joined the Company in 2008 as its President and Chief Operating Officer and subsequently assumed the position of CEO in 2009. Defendant Freda served as President and CEO and as a member of the Board from 2009 until his retirement was announced in August 2024. Defendant Freda is a named individual defendant in the Securities Action, and had claims for federal securities fraud sustained against him in that case.

77. Defendant Travis served as EVP and CFO of Lauder from 2012 until she announced her retirement in July 2024. Defendant Travis is named as an individual defendant in the Securities Action, and she has had federal securities fraud claims against her in that case.

78. Defendants W. Lauder, Barshefsky, de La Faverie, Fribourg, Hyman, G. Lauder, J. Lauder, Nunez, Sternlicht, Tejada, Zannino, Freda, and Travis are collectively referred to herein as the "Individual Defendants."

79. Defendants W. Lauder, Barshefsky, de La Faverie, Fribourg, Hyman, G. Lauder, J. Lauder, Nunez, Sternlicht, Tejada, and Zannino are collectively referred to herein as the "Demand Defendants."

80. Defendants Freda and Travis are collectively referred to herein as the "Officer Defendants."

## IV. DUTIES OF THE INDIVIDUAL DEFENDANTS

81. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its stockholders so as

to benefit all stockholders equally and not in furtherance of their personal interests or benefit. Each director and officer owed to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

82. The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

83. At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

84. To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

a. manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

b. neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

c. establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d. neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e. ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f. conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g. ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h. remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

85. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the

remaining defendants.

## V. FACTS

### A. Lauder's Prestige Beauty Brand

86. Lauder, founded in 1946, is now one of the world's leading beauty companies that manufactures, markets, and sells skin care, makeup, fragrance, and hair care products worldwide. As of January 2024, Lauder held a 13.6% share of the global beauty market, making it the second largest beauty company in the world.

87. Members of the Lauder family remain "at the heart of" the "family-controlled company." For example, Leonard A. Laudner — son of founders Estée and Joseph Lauder — served as CEO of the Company from 1982 through 1999. His son, defendant W. Lauder, served as CEO of the Company from 2004 to 2009, and as its Executive Chairman from 2009 until November 2024.

88. Since stepping down as the CEO in 2009, defendant W. Lauder has remained closely involved with the Company. In addition to serving as Executive Chairman from 2009 until November 2024, defendant W. Lauder still serves as Chairman of the Board. In these roles, according to the Company's public filings, defendant W. Lauder has "work[ed] with the CEO to set overall vision, strategy, financial objective, and investment priorities for the business" and "provide[d] high-level leadership in areas that are important to the Company [.]"

89. Lauder sells its products in approximately 150 countries and territories under a number of well-known, brand names, including: Estée Lauder, Aramis, Clinique, Lab Series, Origins, M·A·C, Bobbi Brown, La Mer, Aveda, Jo Malone, Bumble & Bumble, Tom Ford Beauty, Kilian Paris, Dr.Jart+, and Le Labo. The brands under the Lauder's umbrella "are differentiated by numerous factors, including quality, performance, a particular lifestyle, where they are distributed (e.g., prestige or mass) and price point."

90. Certain best-selling "hero" products sold under Lauder's various prestige brands have historically been in high demand and fetch extremely high prices. For instance, the La Mer brand—one of Lauder's leading luxury brands—sells a moisturizer called Crème de la Mer, a "hero" product that retails for $380 for a 2-ounce jar and $2,675 for a 16.5-ounce jar on La Mer's U.S. website. Likewise, the Estée Lauder brand—the Company's "heritage" brand—sells a 3.9-ounce bottle of Advanced Night Repair Serum Synchronized Multi-Recovery Complex that retails for $245 on Estée Lauder's U.S. website.

91. Lauder's prestige reputation is critical to its brand. The Company describes itself as a "leader in the beauty industry due to the global recognition of our brand names, our excellence in product innovation, our strong position in key geographic markets and the consistently high quality" of its products. Lauder makes similar disclosures in its SEC filings: "[w]e sell our prestige products through distribution channels that complement the luxury image and prestige status of our brands, and we provide 'High-Touch' consumer experiences across our distribution channels. . . . We believe that our strategy of pursuing selective distribution heightens the aspirational quality of our brands."

92. For this reason, Lauder sells its products through distribution "channels" and into retail locations that reinforce its prestige brand image, such as department stores, specialty-multi retailers, upscale perfumeries, salons, spas, Lauder's own freestanding stores, retailer websites, third-party online malls, stores in airports, and duty-free locations.

**B. <u>Lauder's Travel Retail Business Segment</u>**

93. Lauder's travel retail business segment "covers the world of duty-free environments including airports, airlines, cruises, downtown locations and border shops." Because products sold in these locations are purchased for international use, they are exempt from import and sales taxes. Lauder's travel retail channels are intended to reinforce its prestige band image

through the luxury of overseas travel.

94. In recent years, travel retail has become one of Lauder's fastest growing and most profitable channels. During the Relevant Period, travel retail accounted for roughly one-third of Lauder's annual revenue. The percentage of Lauder's revenue derived from travel retail has significantly increased over time from 6% in 2009, to 18% in 2018, to 28% in 2021.

95. Analysts at Morgan Stanley acknowledged this trend at Lauder, and on December 16, 2019 commented that Lauder's "favorable channel mix shift . . . towards high growth (and much higher margin) channels and geographies, including e-commerce, travel retail, emerging markets, and specialty channel underpins our long-term bullish outlook." Similarly, analysts acknowledged the importance of travel retail to Lauder's overall financial performance. On February 23, 2023, analysts at Credit Suisse expressed their view that "EL's travel retail revenues are poised to step-change higher very quickly and will continue to be a significant driver for several quarters."

96. While critically important to the Company, Lauder's reporting for its travel retail segment has been far from transparent. Operated out of Switzerland, travel retail at Lauder is divided into three geographic regions ostensibly based on where sales occur: APAC, Europe, Middle East, and Africa ("EMEA"), and Americas. However, since 2019, Lauder has grouped and reported all global travel retail sales in its EMEA region regardless of where the sale took place across the globe. Lauder's 2021-2023 Annual 10-Ks relegate this significant fact to a footnote.[13] By grouping travel retail worldwide into the EMEA region sales reporting, Lauder was able to

13 Specifically, during the Relevant Period, Lauder's 2022 and 2023 Annual 10-Ks stated: "The net sales from the Company's travel retail business are included in Europe, the Middle East & Africa region, with the exception of Dr. Jart+ in the travel retail channel that are reflected in Korea in the Asia/Pacific region. Operating income attributable to the travel retail sales included in the Europe, the Middle East & Africa is included in that region and in The Americas."

obscure what region or subregion was actually driving its travel retail sales.[14]

### C. Lauder's Focus on Chinese Consumers Via Travel Retail

97. Consumer demand for luxury beauty goods is particularly high in China. However, the price of luxury beauty products is significantly higher in China as compared to other countries worldwide. Accordingly, the ability to purchase expensive, luxury beauty products in duty-free (and thus tax free) shops appeals greatly to Chinese consumers. For these reasons, Lauder became focused on selling to Chinese end-consumers through its travel retail channels. Despite Lauder's opaque travel retail reporting, China was far and away the most important end-consumer location amongst the Company's travel retail business segment. Stockholders and analysts understood this fact. Indeed, on August 10, 2021, an analyst at Wells Fargo acknowledged that "China is increasingly a driver of EL's global travel retail growth."

98. In addition, Chinese travel retail also held the important distinction of being the segment where Lauder's largest customer operated. Lauder's largest customer was critically important for the Company and accounted for a massive (and growing) portion of its Company-wide net sales. Specifically, this critical and unnamed customer accounted for 14% for fiscal 2021, 7% for fiscal 2020, and 5% for fiscal 2019. Analysts have identified this "largest customer" as CDFG, a subsidiary of CTGDF, a Chinese state-owned franchise company authorized by the State Council to carry out nationwide duty-free business in China. CDFG is the world's number one

---

14 Complicating matters, at the beginning of the Relevant Period, Lauder's travel retail leadership changed. On March 7, 2022, Lauder announced that then-Global President, travel retail and Retail Development, Olivier Bottrie ("Mr. Bottrie"), would exit the Company on June 30, 2022 to retire after 26 years with Lauder. During Mr. Bottrie's tenure with Lauder, travel retail jumped from 6% of Lauder's net sales in 2004 to 28% in 2021. Under Mr. Bottrie's leadership, Lauder steadily increased the degree to which it profited from travel retail sales. Following Bottrie's departure, Mr. Assa was appointed to fill the position. Mr. Assa assumed the title of Global President, Travel Retail and Retail Development on May 1, 2022, which he continued to hold until his departure from the Company in December 2024.

travel retailer by sales.

### D. Hainan: China's Domestic Duty-Free Island

99. In addition to more traditional, international duty-free locations like airports, China's southernmost island province, Hainan, has grown into a massive, Chinese-sponsored domestic duty-free shopping hub. Hainan Island sits just twelve miles off the coast of the mainland and is easily accessible via various forms of transport, including airplane, train, bus, and ferry service.

100. Because up to 90% of China's population does not have a passport, travel to domestic locations like Hainan is particularly popular. In 2011, to boost the local Hainanese (and overall Chinese) economy, the Chinese government introduced the Hainan Duty-Free Policy, which allows Hainan's visitors to purchase duty-free goods domestically at designated shops on the island without having to travel internationally. At the time it was enacted, the Hainan Duty-Free Policy allowed the island's tourists to purchase up to 30,000 RMB worth of goods per person.

101. The Individual Defendants highlighted the importance of Hainan to Lauder's travel retail segment. Lauder was all in on the opportunity presented by Hainan in the wake of its expanded duty-free purchasing limits. For example, on February 5, 2021, defendant Freda touted that "[w]ithin China domestic, Hainan is the star. And it's driven by the new traffic and by the increased conversion and by the quantities purchased because of the regulations . . . and by the development of retail."

### E. Asia Travel Retail's Basement Exchange: China's *Daigou* Gray Market

102. Duty-free shopping provided easy access to discounted, but highly demanded, luxury products. *Daigou*, which translates from Chinese to English as "buy on behalf of," is also known as surrogate shopping. *Daigou* exchanges occur when large quantities of luxury goods are purchased from duty-free stores and resold at a profit to end-consumers in mainland China.

Referred to by industry commentators as uniquely Chinese, *daigou* is hotly controversial because it acts as an end-run around Chinese tax revenue. It is also publicly condemned by high-end retailers (like Lauder and its competitors) because the mass, discounted sales harm brand image and cannibalize valuable full price sales elsewhere.

103. After a modest start in the 2000's, *daigou* operations have grown increasingly commercial or "corporate" and facilitate their gray market resale through online applications like WeChat and Taobao, which are secure and private. Such corporate *daigou* operations are more sophisticated and require massive bulk purchases to be effective because the *daigou* entity is making its profit off the spread between the duty-free purchase price and the end-consumer price (which still must be below the retail price to be economical to the end-purchaser).

104. As *daigou* enterprises expanded their underground resale networks, certain locations in Asia became purchasing hubs. Internationally, South Korea is a common hotspot for the *daigou* industry based on its proximity to mainland China and relatively favorable luxury goods pricing. Domestically, the Chinese island province of Hainan, discussed above, became a haven for *daigou* while having the distinct advantage of being a domestic island with favorable duty-free policies that allow tourists to purchase luxury goods at lower prices compared to mainland China. Though purchases for *daigou* gray market resale can occur in any travel retail location, these two geographic locales became hotspots for the *daigou* industry to bulk purchase duty-free luxury items to be resold on the gray market.

105. Critical to the scheme alleged herein, Lauder had the ability to control the flow of its products to locations where the *daigou* industry procured duty-free goods, like Hainan and South Korea, for gray market resale and did exactly that to meet its sales goals.

106. On January 1, 2019, China passed the ECL. The ECL required *daigou* operations

to obtain licenses and formally register as a business. Failure to do so subjected *daigou* industry participants to fines as high as $291,620 USD for illegal business and tax evasion. Essentially, the ECL sought to impose taxes on *daigou* participants to disincentivize the practice by cutting into the profits gained by taking advantage of duty-free tax avoidance. Despite these efforts by Chinese authorities, the *daigou* gray market continued to operate against the backdrop of — or rather through the basements of — legitimate travel retail channels, shielded from public view.

### F. The Individual Defendants Publicly Deny Use of *Daigou* to Boost Sales

107. A myriad of known risk accompanied participating in *daigou* activity: volatile regulatory landscapes, unpredictable enforcement, geographic overconcentration, trade interruptions, unstable demand, inventory surplus, consumer discount dependency, dilution of brand equity, and loss of price control. For these reasons, luxury brand companies (and their stockholders) publicly condemned *daigou* resellers.

108. For example, Lauder's direct competitor, LVMH, has publicly emphasized that *daigou* gray market resale "has a terrible negative effect on the image of the brand" engaging it. In January 2022, LVMH specifically remarked that brand equity is harmed by the *daigou* industry, when products go "straight from the store, or rather from the basement[] of that store to retailers in China who sell them at a discount." The following year, in January 2023, LVMH was again quoted admonishing *daigou*, saying, "[f]or your image, there is nothing worse. It's dreadful."

109. The Individual Defendants likewise outwardly condemned the practice of *daigou* to stockholders and was aware of the threats that the *daigou* gray market posed to the Company's travel retail business. On February 5, 2019, in a Company earnings call for 2Q19, defendant Freda responded to an analyst's question regarding the "impact" of China's ECL on Lauder's travel retail business. Defendant Freda commented on the "*daigou* phenomenon" by stating:

> First of all, our Travel Retail business has not seen the impact from the stricter

> enforcement through January. So we don't see the impact so far. It is also important, however, to remember that ***we at Estée Lauder companies have a long-standing policy that limits the numbers of products that a single consumer can buy at any counter in our travel retail globally – since ever***. So we were never benefiting from a lot of the *daigou* business because of ***our strict policies to avoid any phenomenon like this and, obviously, to limit any risk of gray market around the world***.

110. Defendant Freda's response to the analyst's inquiry demonstrated both an awareness of the potential impact of governmental regulations relating to the *daigou* gray market, as well as Lauder's internal mechanisms to track and limit the flow of its products into gray market resale.[15]

### G. Despite the Known Risks, Lauder Floods *Daigou* with Product to Grow Sales and Becomes Over-Dependent

111. Despite a public vow in 2019 to "limit any risk of gray market around the world," the Company purposefully pumped large amounts of product into the *daigou* gray market to cover up slow sales growth and became dependent on the level of revenue it generated. Specifically, in 2020, Lauder tapped into the back-alley, high-volume sales of the *daigou* gray market to cover up lagging sales growth resulting from the global COVID-19 pandemic.

112. Beginning on July 1, 2020, China dramatically expanded duty-free shopping limits to 100,000 RMB ($13,900.67 USD) worth of goods per person in order to stimulate the local economy. Faced with suppressed travel retail sales and an attractive new duty-free opportunity in Hainan, Lauder used *daigou* gray market resale to boost sales and quickly became dependent on

---

[15] A commitment to repudiating gray market resale extends back quite far in the Company's history. While he was serving as the Company's CEO, defendant W. Lauder – the grandson of the Company's founders – spoke on an earnings call on May 3, 2007 about Lauder's "strategic decision to cut back a certain group of retailers in the shipments we were making . . . to a very significant degree because we found that there was a great deal of gray market activity going on from these retailers." Defendant W. Lauder not only renounced the gray market – in this instance involving retailers in Spain – but showed the Company's ability to control the flow of Lauder products into the gray market through control of its shipments, noting that "significant quantities of [Lauder's] merchandise was showing up in markets well outside of Spain, well outside of our established distribution and to far greater quantities than we were comfortable with."

the gray market to maintain its sales figures.

113. Numerous confidential witness accounts in the Securities Complaint from former Lauder employees confirmed that Lauder over-relied on *daigou* to grow sales in its travel retail business. With respect to the Company's travel retail business, FE-2 recalled that it had been a focus or strategic growth initiative for Lauder for a while, even prior to the pandemic. FE-2 described travel retail as an area of Lauder's biggest growth, going "way back." FE-2 further explained that travel retail was one of Lauder's "largest growth pillars" and part of its "key strategic initiatives." FE-2 also described the manner in which certain regions, like Lauder's North America market, were not growing and experienced a lot of decline in sales through traditional retail outlets during her employment with the Company.

114. FE-3 explained that China and particularly Hainan were "huge markets." FE-1 recalled that there was a shift from South Korea to China in the Travel Retail space during 2020 when the new regulations increased purchasing limits in Hainan. FE-1 further explained that the *daigou* had "very big businesses" with "structures in place" and is now primarily made up of medium and "corporate *daigou*," who deal directly with retailers, and less individual *daigou*.

115. FE-2 indicated that there was a huge amount of pressure every quarter to deliver sales results, and that sometimes that pressure, and the demands management made on its staff, were unreasonable and uncomfortable. FE-2 reiterated that there was "huge pressure" to improve Lauder's top line through sales growth, which happened "very often," as Lauder was positioned as a growth company. Additionally, FE-2 recalled that Lauder sometimes asked its brand teams to do what it could to including moving launches to be first to market, change promotional calendars or accelerate new distribution.

116. FE-1 continued to say that companies could control the *daigou* market by limiting

the supply of goods provided to duty-free locations, but preferred to sell more product, which came at the risk of "flooding the market." Similarly, FE-3 further explained that the movement of product into *daigou* channels was "activated" through retailers, such as *China Duty Free Group* and that Lauder utilized "incentives" in order to facilitate that movement. FE-3 recalled products moving into these channels both through physical sales on the shop floor and via internet purchases. According to FE-1, practices during this period "overflooded" the market. FE-1 recalled that large purchases made during the pandemic, from 2020 through her tenure at Lauder, were "almost definitely" made by *daigou*. FE-1 remembered that the biggest issue during her tenure was "high" stock holdings of retailers in Hainan, China. FE-1 noted that this period was "very challenging for the business."

117. Additionally, FE-1 described Lauder as being "much looser" when it came to "loading" retailers with stock in comparison to its competitors, such as L'Oréal. FE-1 explained that Lauder "took a lot of market share" during the pandemic and that this was "very telling" because *daigou* were the only people buying product at that time. FE-1 commented that while Lauder's increased market share was "nice on paper," Lauder's gains in its market share came from *daigou* business. FE-1 continued to say that Lauder is now seeing the "repercussions" from their reliance on *daigou* during this period. FE-1 described the data surrounding Lauder's jump in market share as "very jarring."

118. FE-2 remarked that it was hard to reconcile the growth of travel retail in China with the lockdowns and lack of travel, stating that it did not make sense and that the growth was "counterintuitive." FE-2 explained that "things didn't make sense" and that she could not "square" certain things that she observed.

119. FE-2 elaborated that there was too much pressure on sales growth, and that she

could not understand why some people at the Company – who did not appear to be nice or good at their jobs – were able to survive and keep their positions at Lauder, for example in the supply chain. FE-2 figured that those people who did survive at Lauder must be "up to something," like using the gray market of *daigou* resellers, to enable the practice.

120. FE-3 stated that, that if there were issues with overstocks that Lauder would "bulk ship" to places like Korea, where it was known that a *daigou* market existed, to cover losses. According to FE-3, the Company would "switch on the *daigou* market if needed," including sending "popular" products into these channels. FE-3 explained that products were "held back" so that they could be sent into areas with an extensive *daigou* market during "crunch time" of the fiscal year. Further, FE-3 recalled promotions also being utilized to send product into these channels. Further, FE-3 recalled that there was an emphasis on sending stock to APAC, which left other regions short of product, despite having retailers asking and ready to sell product while APAC was still experiencing lockdowns. FE-3 added that "popular" product was frequently held back from Europe in order to send to APAC.

121. Similarly, FE-1 described instances where it was important that Lauder move products with upcoming expiration dates "out of warehouses and into the channels." In such instances, FE-1 stated that Lauder "pushed products as fast as they can."

122. The confidential FE accounts in the Securities Complaint confirm internal Company knowledge at the highest levels regarding Lauder's declining net sales in Asia travel retail resulting from regulatory and retailer crackdowns on *daigou* activity. For example, FE-2 confirmed that Lauder's executive leadership knew about the *daigou* reselling practice. FE-2 confirmed that the Company and its leadership could see sales spikes which were attributed to *daigou* practices. FE-2 confirmed that Lauder had "clear visibility" in its sales because the

Company had very detailed sell-through and sales reporting information from its retail partners. FE-2 described that Lauder monitored this data on a weekly and monthly basis and held monthly estimate meetings with senior CFOs for various regions, during which sales data was reviewed in detail by the retailer, brand, and key product lines.

123. FE-2 elaborated that that you could see sales spikes in key stores and/or key items that were out of sync with historic norms and it would make you question the sales spikes at certain stores, regions based on which items had spikes. FE-2 went on to say that it would then become clear that they were for *daigou* or "suitcase trade" and had correlations with activities or promotions in China.

124. FE-2 also advised that Lauder's brands with the biggest business in China were the higher-priced, more prestige brands, such as Estée Lauder and La Mer. FE-2 advised speaking with former Demand Planners at Estée Lauder. FE-2 noted that Lauder held monthly and sometimes weekly demand planning meetings, which were "brutal" with abuse. FE-2 further noted that there was plenty of information available at these meetings to "triangulate" the correct sources of the sales, including the impact of the *daigou* or gray market sales. Regarding pricing differentials between North America and China, FE-2 explained that Estée Lauder maintained a global database of pricing for every product in every market and region. FE-2 noted that, in China, Estée Lauder's products were sometimes sold up to a substantial premium over North American prices.

125. FE-2 added that the Company employed pricing teams which worked on analyzing the disparities in pricing, factoring in different markets, demand, exchange rates, and other variables, such as competition. FE-2 further added that "everyone" knew the price differentials based on the pricing database. FE-2 explained that the pricing database was updated

fairly regularly, and the tool used for the database was called Anaplan. FE-2 recalled that there was a team of about 5-10 people working on it, and that the head of that team became Chief of Staff for defendant Travis. FE-2 described how the database was used to track exchange rates and other differentials between brands and regions. The database, FE-2 continued, was used to prepare slide decks and reports which were presented to the company's senior executives, including defendant Freda, who were briefed on these pricing differentials.

126. According to FE-3, "everyone" in leadership was aware of the *daigou* market, but it was not formally discussed. FE-3 noted that "everyone was very aware," despite *daigou* not being formally discussed in Europe. According to FE-3, there was a whole team involved in the process led by the former Global President Travel Retail, Mr. Assa. FE-3 explained that there was a team that was a part of travel retail APAC that specifically analyzed the *daigou* market. According to FE-3, there was a "huge" amount of people on the Commercial Team in Singapore, the head office for APAC, that reported into Global Travel Retail and whose responsibilities included analyzing the *daigou* market. Further, FE-3 explained that there was a "team" and a "structure in place" to analyze the *daigou* market, which included the employee who was "heading up Korea" that worked directly with Mr. Assa on this issue.

127. FE-3 continued to say that the movement of product into *daigou* channels was "overseen," "approved," and "activated" by Mr. Assa. FE-3 explained that "everything, absolutely everything" was approved by Mr. Assa and that he had influence over the process while occupying his prior role as President, Commercial Estée Lauder Travel Retail Worldwide. According to FE-3, Mr. Assa was also responsible for allocating product to the various regions and *daigou* was taken into account when making these decisions. FE-3 explained that these allocation decisions even occurred while global pandemic lockdowns were in place, whereby travel retail shipments

all went to China.

128. FE-2 also explained that Lauder used "pincodes" for certain products to know if those products were going someplace where they were not supposed to be. FE-2 further advised that the more expensive products from Lauder and La Mer products (as examples) would be pincoded in Estée Lauder's systems to trace where they came from and if they ended up in an unusual place. FE-2 further confirmed that if a product was pincoded, Estée Lauder had the ability to see where the product ended up. Similarly, FE-1 that all products had tracking codes in order to exercise "market control."

### H. CDFG Pledge and Government Crackdowns in Hainan Stop Lauder's Ability to Drive Revenue Through *Daigou*

129. Lauder's ability to rely on the *daigou* market to drive sales was about to meet an abrupt end. First, in mid-2021, Lauder's largest customer — CDFG — announced that it would no longer allow any sales into the *daigou* gray market. Given the importance of CDFG to Lauder's sales and profitability, CDFG's refusal to continue to engage in *daigou* posed an imminent threat to Lauder's ability to rely on this unsustainable sales channel to drive sales growth.

130. Specifically, in response to the sentiment that the *daigou* industry in Hainan posed a grave, long-term threat to the health of the island's economy, CDFG, which held an estimated 90% to 99% share of the market in Hainan, issued a public statement signaling its solidarity with the Chinese government's efforts to combat gray market resale:

> In order to enable this engine to exert its strongest momentum and provide tourists with a better shopping experience, ***it is necessary to maintain the healthy ecology of the offshore duty free industry, severely cracking down on purchasing agents and preventing market risks. That has become the unshirkable responsibility of market entities***.

131. CDFG cited numerous enforcement actions undertaken by Hainan customs, including "knocking out 80 pirate buying gangs" between July 1, 2020 and July 1, 2021,

underscoring the chaos that the *daigou* industry had brought to Hainan in just one year since the Hainan Duty-Free Policy was expanded.

132. Analysts at Jefferies covering CDFG noted on August 5, 2021 that the "Hainan government has decided to take a stricter approach" when it came to *daigou* activities. It remarked on CTGDF's — CDFG's parent company — marketing campaigns and traceable QR codes to enforce policies against *daigou* resale. Analysts commented that, "these regulatory actions aim to deter *Daigou* and creates a business environment that respects the rule of law[.]"

133. A few months later, Hainan publicized impending regulations that echoed the policy positions endorsed earlier in the year by CDFG. On December 7, 2021, the Office of Free Trade Port Working Committee of the Hainan Provincial Committee published a statement on WeChat announcing new regulations. It explained that they were designed to "resolutely crack down on illegal *daigou* and smuggling." The regulations were meant to "have a strong impact on *daigou* — both individuals involved in purchasing ton behalf of other (transferring their tax exemption quota to a *daigou* company) as well as large-scale *daigou* companies that resell duty free products in violation of regulations." Hainan set the formal regulation to take effect on January 1, 2022.

134. By January 1, 2022, it was known internally at Lauder that the valve supplying the Company's inflated travel retail sales — *daigou* gray market resale — was tightening and about to close. On that date, new regulations in Hainan took effect memorializing ongoing efforts to "crackdown" on *daigou* activities in Hainan to preserve the long-term viability of duty-free sales on the island. Over the course of the next twenty-two months, the Individual Defendants continuously misled stockholders regarding the cause and extent of Lauder's travel retail net sales declines, failing to disclose that the Company had become heavily reliant on the *daigou* gray

market to generate sales within the travel retail segment and that its net sales would decline as a result of no longer being able to rely on this sales channel to drive sales growth.

### I. The Individual Defendants Lead Stockholders to Believe Lauder's Asia Travel Retail Business Is Prospering, Despite Knowing the Company's Pipeline to Gray Market Sales Shut

135. With the Company having become dependent on *daigou* gray market resale by the time the January 1, 2022 Hainan *daigou* crackdowns took effect, the Individual Defendants scrambled to triage the cascading impact of the regulatory crackdowns and the refusal of the Company's biggest customer to engage in *daigou* business. In doing so, the Individual Defendants made a series of public misrepresentations and omissions concerning the extent and cause of declining net sales in Lauder's travel retail business segment.

136. On February 3, 2022, the Individual Defendants publicly touted the Company's continued sales growth in the Asia travel retail segment. On that day, the Individual Defendants also caused Lauder to report its 2Q22 financial results, for the period ended December 31, 2021. Critically, the Individual Defendants' statements on this day concerned the Company's financial results for the three-month period preceding the January 1, 2022 enactment of China's regulatory crackdown on *daigou*. As a result, the Individual Defendants' February 3, 2022 statements captured financial results during a period when Lauder's sales figures were still largely attributable to *daigou*.

137. Notwithstanding, the Individual Defendants falsely and misleadingly attributed the reported sales growth within the travel retail segment to sustainable, market-driven factors, such as the "continued strength" of Lauder's brand, while failing to disclose that the Company's travel retail growth was the product of unsustainable gray market resale through the *daigou*. For example, on Lauder's 2Q22 Earnings Call, defendant Freda boasted that "***[n]et sales increased in our travel retail business . . . reflecting continued strength of our brands with the Chinese***

***consumer***" and touted that the Company "***continue[s] to prosper in the east with Chinese consumers as well as in global travel retail***." The Individual Defendants' statements misleadingly concealed from stockholders the fact that Lauder achieved this growth in travel retail by feeding the *daigou* gray market, rather than sustainable factors such as "***continued strength of [its] brands***."

138. As the Relevant Period progressed, the Individual Defendants continued to make false and misleading statements about sales growth within Lauder's travel retail segment and Hainan, despite knowing that the Company had lost the ability to boost sales through *daigou*. For example, on May 3, 2022, during Lauder's 3Q22 Earnings Call, the Individual Defendants continued to represent to stockholders that the Company's "***confidence into Hainan['s] future is unchanged[,] actually increased***." This statement was false and misleading because it represented an "***unchanged***" landscape in Hainan despite the loss of *daigou* sales having materially altered Lauder's ability to maintain its travel retail sales through traditional retail exchanges.

139. As travel retail sales diminished, the Individual Defendants also misled stockholders through statements attributing Lauder's prior sales growth in travel retail on Hainan Island to customers engaging in above-board travel retail purchases. For example, on June 2, 2022, defendant Freda spoke at the Bernstein Strategic Decisions Conference, where he credited Lauder's "***incredible results in travel retail*** during the COVID Western lockdowns" to the fact that "***Hainan was more than substituting the amount of travelers in airports around the world***." During the conference, defendant Freda fielded questions about China's current 2022 lockdowns, which he compared to past lockdowns "in the US, in Europe during 2020." In doing so, defendant Freda attributed Lauder's previous "incredible results in travel retail ***during the COVID Western lockdowns***" in 2020 to Hainan supplanting airport travelers globally at that time. However, this

statement was materially false and misleading because *daigou* gray market resale was the true source of Lauder's travel retail growth in Hainan at that time in 2020, which did not equate to "travelers in airports" at all. Rather, Lauder's prior, formidable travel retail sales figures were attributable to the corporate *daigou* industry and its gray market reselling. The Individual Defendants capped off Lauder's fourth quarter with similar sentiments lauding the success of Hainan while concealing from stockholders the severe impact the closed pipeline to the *daigou* gray market had on Company sales. On August 18, 2022, during Lauder's 4Q22 Earnings Call, defendant Freda stated that "***the power of Hainan in the future remain[s] intact***." Defendant Freda's statement again gave stockholders the false impression of a fruitful and unchanged market in Hainan. However, Lauder could not stem the tide of the *daigou* regulatory crackdowns forever.

140. Analysts absorbing the August 18, 2022 messaging accepted these statements of continued success in Asia travel retail in formulating their market guidance. For example, on August 18, 2022, analysts at Bernstein stated, "we continue to believe that China is likely to be the primary driver of the premium beauty category over the medium-term."

### J. The Truth Gradually Emerges and Lauder's Stock Price Declines as the Individual Defendants Incrementally Report Poor Financial Results and Offer False and Misleading Reassurances to Stockholders

141. The truth began to emerge, through a series of partial disclosures in late 2022 and 2023. As Lauder's ability to use *daigou* gray market resellers to generate sales evaporated, its inventory piled up, forcing the Individual Defendants to repeatedly issue lowered revenue forecasts. Throughout the Relevant Period, the Individual Defendants represented to stockholders that a host of other issues were driving Lauder's declining sales: episodic lockdowns due to COVID-19 variant surges, supply chain issues, retailers tightening inventory, and inflation, among others. The Individual Defendants' disclosure of those issues misleadingly concealed the actual root cause of Lauder's travel retail sales declines — the inability to rely on the *daigou* gray market

to prop up sales.

142. Eventually, the house of cards began to topple as the Individual Defendants were forced to begin revealing declining sales in Lauder's travel retail business and the negative impact it was having on the Company's financial outlook. Specifically, on November 2, 2022, the Individual Defendants caused Lauder to issue a press release announcing financial results for its first quarter of 2022. The press release announced a reduced full year outlook for 2023, which the Individual Defendants claimed was reduced "primarily to reflect tighter inventory management in Asia travel retail, given reduced traffic as a result of COVID-19 restrictions." The market reacted accordingly, and Lauder's stock price dropped over 8%, a reduction of $16.80 per share, bringing the share price down to $189.96 at closing.

143. Importantly, with respect to the revelation about "tighter inventory management," analysts began to wonder why Lauder was feeling the effects of the cited market conditions more than its competitors. For example, on November 2, 2022, Evercore ISI noted that "Covid restrictions in China have triggered significant retailer destocking — ***much greater than what L'Oréal indicated***" — even posing the questions: "Why Hainan destocking will carry into 2Q, given that sell-through was up + 9% this 1Q, as per L'Oréal?" Unbeknownst to stockholders, Lauder's self-created overdependence on *daigou* drove its "inventory management" issues because the Company could no longer funnel inventory into the *daigou* gray market for illicit, cheap resale.

144. On November 2, 2022, notwithstanding this disclosure, the Individual Defendants offered reassurance to stockholders that they "***anticipate[d] sequential acceleration . . . as these pressures begin to abate***." Further, the Individual Defendants remarked on the COVID-19 restrictions in Asia travel retail and Hainan in particular as a "***near-term temporary pause***" that "***does not diminish our deep conviction in Hainan for the long term***." The Individual Defendants'

encouragement, however, was false and misleading because Lauder's inability to tap into *daigou* gray market resale after China's 2022 regulatory crackdowns took effect was more than a mere "***temporary pause***"— it was a permanent loss of a major source of sales in the travel retail segment. Having made Lauder overdependent on a stream of revenue that was now restricted by the Chinese government and Lauder's largest retailer alike, the Individual Defendants knew that even if the misleadingly disclosed "***pressures***" were to "***abate***," they would not resolve Lauder's inability to effect sales through the *daigou* gray market.

145. Contrary to the Individual Defendants' reassurances, Lauder's stock price continued to drop as the Individual Defendants revealed new information about the continued decline in travel retail sales caused by the Company's over reliance on *daigou* to drive sales. For example, on February 2, 2023, the Individual Defendants again lowered Lauder's outlook for fiscal 2023, due to the "disruption to travel and staffing levels in Hainan that slowed the expected normalization of inventory and the recently announced potential roll-back of COVID-related supportive measures in Korea duty free." As a result, shares of Lauder's common stock declined by nearly 4.5%, a reduction of $12.39 per share, bringing the share price down to $268.41 on February 2, 2023.

146. Nonetheless, on February 2, 2023, the Individual Defendants continued to misrepresent the Company's business position and reassure stockholders during Lauder's 2Q23 Earnings Call, noting that "inventory levels are still coming down in Hainan," and that the Company was "***sitting on a decent amount of inventory . . . to supply the sales that we expect to see in the fourth quarter***." The Individual Defendants' statements were materially false and misleading because the rosy picture they painted of inventory ready to be sold concealed and omitted the fact that Lauder's Asia travel retail sales were dependent on a now non-existent gray

market that could no longer pad sales.

147. The Individual Defendants' disclosures and reassurances surrounding Lauder's inventory levels misled stockholders as to the reason for inventory problems in the first place, which was that Lauder could no longer funnel its products into corporate *daigou* for gray market resale. As a result of these false and misleading statements, analysts believed the Individual Defendants' reassurances. In fact, Barclays Research reported the next day that "we came away from the quarter feeling more comfortable on the visibility of Estee Lauder's recovery in China and China Travel Retail (~34% of total company sales) particularly as in mainland China the company is outpacing the market and shipments were in-line with consumption."

148. On May 3, 2023, the Company's poor financial results continued to slide beyond expectations as the Individual Defendants caused Lauder to issue a press release announcing financial results for its 3Q23 ended March 31, 2023. On that date, the Individual Defendants announced yet another reduction of fiscal year 2023 guidance because of the slow recovery in Asia travel retail markets. As a result of these revelations, Lauder's common stock declined over 17%, a reduction of $42.52 per share, bringing the share price down to $202.70 on May 3, 2023.

149. Despite this disclosure (and the resulting stock drop), the Individual Defendants nonetheless continued to reassure stockholders that sales would rebound despite knowing the opposite to be true given that the Company could no longer rely on *daigou* to boost sales. For instance, defendant Freda misleadingly claimed during Lauder's May 3, 2023 earnings call that "[e]ncouragingly, retail sales performance is significantly ahead of organic sales results in Global travel retail, ***which gives us confidence that the challenges in travel retail are abated with time***."

150. Such statements continued to be false and misleading because the Chinese government's 2022 *daigou* crackdown, which had gutted Lauder's travel retail sales, would not be

"abated with time." The Individual Defendants' May 3, 2023 misstatements severely misled stockholders as to the cause and extent of Lauder's net sales declines, which, unbeknownst to stockholders, stemmed from Lauder's inability to pump products through the gray market resale pipeline in China following the implementation of government and retailer crackdowns on *daigou*.

151. At this point, the Individual Defendants' false and misleading narrative concerning Lauder's net sales decline in travel retail was becoming increasingly unbelievable. For example, analysts at Deutsche Bank expressed concern about the lowering of Lauder's guidance for the third consecutive time, stating, "[w]hile we appreciate the complexity of current challenges in EL's travel retail (TR) business, the sheer magnitude of the reduced outlook and associated operating deleverage raises questions related to EL's capabilities vis-à-vis demand forecasting, visibility, and supply-chain agility in its most profitable geography and channel."

152. Nevertheless, analysts were again encouraged by the Individual Defendants' reassurances, even believing that the problems in China were only short-term. For example, on May 3, 2023, Piper Sandler Research reported that "[w]e continue to see opportunity for good eventual tailwinds from China and Travel Retail" and that "there's still a lot to like for EL beyond the near term bumpiness, and we suggest investors be patient here and take advantage of today's weakness." That same day Jefferies Research reported that "EL has been able to reclaim market share via promotions, and expects share gains to continue in Q4," and that "[r]ecovery in these markets is a good indicator of Hainan and Korea future performance."

### K. The Individual Defendants Finally Admit *Daigou* Was the Primary Driver of Lauder's Net Sales Decline in Travel Retail, Followed by Layoffs of Thousands of Company Employees

153. On August 18, 2023, prior to market close, the Individual Defendants caused Lauder to release financial results for its fourth fiscal quarter of 2023 and fiscal year ended June 30, 2023. Specifically, these results included a substantial decrease in sales stemming largely from

the travel retail markets in China and South Korea. During the earnings call, defendant Freda admitted that travel retail "***sales trends deteriorated and turned steeply negative from the enforcement actions to control daigou activity***." As a result of these revelations, Lauder's common stock declined over 3%, a reduction of $5.37 per share, bringing the share price down to $156.69 on August 18, 2023. Lauder's stock continued to fall on the next trading day, August 21, 2023, as this news was amplified when it declined an additional 3.7%. Together, both drops on August 18 and 21, 2023 reflected a total decline of nearly 7%.

154. However, the Individual Defendants brazenly continued to mislead stockholders concerning the extent of the Company's reliance on *daigou* as the primary cause of its declining sales. Instead, the Individual Defendants reassured stockholders that any negative effects from *daigou*-related problems were merely "***short term headwinds***" and represented that there were "***no concerns whatsoever*** about travel retail growing with traveling consumers."

155. As a result of the Individual Defendants' false assurances and downplaying of *daigou* issues, analysts were convinced that *daigou* was ***not*** something to worry about. For example, while Piper Sandler Research reported on August 18, 2023 that "*[d]aigou* restrictions are having a negative impact on Travel Retail traffic, with a 'meaningful contraction' in Hainan in May and June," the report further stated that "management is pulling back shipments in FQ1 to rightsize retailer inventory levels," and thus "***[w]e foresee this as a more transitory challenge,*** however, with overall demand in mainland China looking encouraging."

156. The full truth about Lauder's issues was revealed on November 1, 2023, when the Individual Defendants disclosed that Lauder's decline in net sales, "primarily reflect a decline in our Asia travel retail business, ***primarily due to our and our retailers' actions to reset retailer inventory levels, and changes in government and retailer policies related to unstructured market***

***activity***, that led to lower product shipments compared to the prior-year period." This disclosure revealed to stockholders that the declining net sales that Lauder had been attributing for over a year to other causes was "***primarily***" due to and reflective of government and retailer crackdowns on "***unstructured market activity***" meaning the *daigou* gray market. The identification of a primary cause for the net sales decline revealed that the Individual Defendants had used a litany of parallel problems to conceal the root cause of declining travel retail sales from stockholders during the Relevant Period. On this news, the price of Lauder common stock declined nearly ***19%***, a reduction of $24.36 per share, to close at $104.51 on November 1, 2023.

157. *The Daily Telegraph* soon published an article describing the manner in which "Estée Lauder shares have ***plunged to a six year low***" after "[t]he company blamed 'changes in government and retailer policies related to unstructured market activity.' ***This is thought to relate to Beijing's clamp down on daigou resellers***[.]" Notwithstanding the fact that the practice had been shut down, analysts expressed concern about reputational harm to Lauder and revealed signs of being misled by the Individual Defendants' public statements during the Relevant Period. Specifically, Barclays Research, on November 2, 2023, even raised concern that Lauder's reputation was harmed as a result of these *daigou* problems: "we wonder to what degree Estée Lauder's brand equities are already impaired as consumers have become accustomed to buying on discount . . . not to mention the amount of pantry inventory consumers already have at home."

158. In February 2024, Lauder announced layoffs affecting over 3,000 employees. These job cuts were purportedly part of a multi-year plan to rebuild profit margins in 2025 and 2026. With respect to the layoffs, defendant Travis said "we are focused on strategically leveraging our strengths to accelerate our return to a more sustainable profitable growth while elevating our consumer activations and increasing our operating agility." The layoffs amounted to "an expected

net reduction in positions globally of 3% to 5%" and were designed to "right-size and streamline select areas within" the Company.

## VI. THE INDIVIDUAL DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

159. During the Relevant Period, the Individual Defendants made a series of false and misleading statements to stockholders at the same time that Lauder was experiencing a decline in net sales due to its over-reliance on gray market sales generated by *daigou* activity. Specifically, rather than admit the truth about Lauder's declining growth brought on by the inability to continue to rely on gray market sales, throughout the Relevant Period, the Individual Defendants made a series of misrepresentations concerning the true source of the Company's Travel Retail revenues, as well as the extent and cause of net sales declines in its Asia travel retail business.

### A. February 3, 2022 – Second Quarter 2022 Financial Results

160. On February 3, 2022, the Individual Defendants caused Lauder to file its Quarterly Report on SEC Form 10-Q, containing Lauder's financial results for the 2Q22, for the period ended December 31, 2021 (the "2Q22 Financial Results"). The Individual Defendants stated in the 2Q22 Financial Results that:

> ***Net sales increased in our travel retail business in both periods, reflecting continued strength of our brands with the Chinese consumer***, the easing of travel restrictions, which drove increased traffic levels compared to the prior-year periods, and continued success of hero product franchises from La Mer, Origins, Clinique, Jo Malone London and Tom Ford Beauty.

161. The Individual Defendants' February 3, 2022 statements in Lauder's 2Q22 Financial Results were materially false and misleading because they failed to disclose that the reported travel retail net sales increase was generated through *daigou* gray market resale. Critically, the Individual Defendants' February 3, 2022 statements in the 2Q22 Financial Results spoke to net sales increases achieved during Lauder's 2Q22, which captured sales figures from the

period of October 1, 2021 through December 31, 2021. During those months (and as was the case for many quarters before that), Lauder's travel retail sales increased because of its heavy reliance on the *daigou* gray market. The Individual Defendants concealed the Company's reliance on *daigou* to achieve high-volume gray market sales from stockholders.

162. Moreover, the Individual Defendants' above statements in the 2Q22 Financial Results attributed the Company's net sales growth to sustainable factors like the strength of Lauder's brand, which was false and misleading because the Company's net sales growth in travel retail was primarily driven by illicit *daigou* activity. Through this false and misleading growth attribution, the Individual Defendants also concealed from stockholders that Lauder was overdependent on *daigou*, an unsustainable sales practice. Put simply, the Individual Defendants' statements were false and misleading with respect to the primary driver of Lauder's net sales increases. The primary driver was not the "***continued strength of our brands with the Chinese consumer***" but, in fact, unsustainable and undisclosed *daigou* sales.

163. Indeed, as detailed in the Securities Complaint and above, the accounts of multiple FEs confirmed that Lauder over relied on *daigou* to achieve staggering sales growth in its travel retail business. For example, FE-1 explained that companies could control the *daigou* market by limiting the supply of goods provided to duty-free locations, but preferred to sell more product, which came at the risk of "flooding the market." Similarly, FE-3 further explained that the movement of product into *daigou* channels was "activated" through retailers, such as *China Duty Free Group* and that Estée Lauder utilized "incentives" in order to facilitate that movement. FE-3 recalled products moving into these channels both through physical sales on the shop floor and via internet purchases. According to FE-1, practices during this period "overflooded" the market. FE-1 recalled that large purchases made during the pandemic, from 2020 through her tenure at Estée

Lauder, were "almost definitely" made by *daigou*. FE-1 remembered that the biggest issue during her tenure was "high" stock holdings of retailers in Hainan, China. FE-1 noted that this period was "very challenging for the business."

164. Additionally, FE-1 described Lauder as being "much looser" when it came to "loading" retailers with stock in comparison to its competitors, such as L'Oréal. FE-1 explained that Estée Lauder "took a lot of market share" during the pandemic and that this was "very telling" because *daigou* were the only people buying product at that time. FE-1 commented that while Estée Lauder's increased market share was "nice on paper," Lauder's gains in its market share came from *daigou* business. FE-1 continued to say that Estée Lauder is now seeing the "repercussions" from their reliance on *daigou* during this period. FE-1 described the data surrounding Estée Lauder's jump in market share as "very jarring."

165. FE-2 remarked that it was hard to reconcile the growth of travel retail in China with the lockdowns and lack of travel, stating that it did not make sense and that the growth was "counterintuitive." FE-2 explained that "things didn't make sense" and that she could not "square" certain things that she observed.

166. FE-2 elaborated that there was too much pressure on sales growth, and that she could not understand why some people at the Company – who did not appear to be nice or good at their jobs – were able to survive and keep their positions at Lauder, for example in the supply chain. FE-2 figured that those people who did survive at Lauder must be "up to something," like using the gray market of *daigou* resellers, to enable the practice.

167. FE-3 stated that, that if there were issues with overstocks that Lauder would "bulk ship" to places like Korea, where it was known that a *daigou* market existed, to cover losses. According to FE-3, the Company would "switch on the *daigou* market if needed," including

sending "popular" products into these channels. FE-3 explained that products were "held back" so that they could be sent into areas with an extensive *daigou* market during "crunch time" of the fiscal year. Further, FE-3 recalled promotions also being utilized to send product into these channels. Further, FE-3 recalled that there was an emphasis on sending stock to APAC, which left other regions short of product, despite having retailers asking and ready to sell product while APAC was still experiencing lockdowns. FE-3 added that "popular" product was frequently held back from Europe in order to send to APAC.

168. Similarly, FE-1 described instances where it was important that Lauder move products with upcoming expiration dates "out of warehouses and into the channels." In such instances, FE-1 stated that Lauder "pushed products as fast as they can."

169. Additionally, as detailed in the Securities Complaint and above, the accounts of numerous FEs confirmed that the manner in which *daigou* affected Lauder's sales growth was known internally at the highest levels of the Company. For example, FE-2 confirmed that Lauder's executive leadership knew about the *daigou* reselling practice. FE-2 confirmed that the Company and its leadership could see sales spikes which were attributed to *daigou* practices. FE 2 confirmed that Lauder had "clear visibility" in its sales because the Company had very detailed sell-through and sales reporting information from its retail partners. FE-2 described that Lauder monitored this data on a weekly and monthly basis and held monthly estimate meetings with senior CFOs for various regions, during which sales data was reviewed in detail by the retailer, brand, and key product lines.

170. FE-2 elaborated that that you could see sales spikes in key stores and/or key items that were out of sync with historic norms and it would make you question the sales spikes at certain stores, regions based on which items had spikes. FE-2 went on to say that it would then become

clear that they were for *daigou* or "suitcase trade" and had correlations with activities or promotions in China. FE-2 also advised that Lauder's brands with the biggest business in China were the higher-priced, more prestige brands, such as Estée Lauder and La Mer.

171. Similarly, according to FE-3, there was a whole team involved in the process led by Mr. Assa. FE-3 explained that there was a team that was a part of travel retail APAC that specifically analyzed the *daigou* market. According to FE-3, there was a "huge" amount of people on the Commercial Team in Singapore, the head office for APAC, that reported into Global Travel Retail and whose responsibilities included analyzing the *daigou* market. Further, FE-3 explained that there was a "team" and a "structure in place" to analyze the *daigou* market, which included the employee who was "heading up Korea" that worked directly with Mr. Assa on this issue.

172. FE-3 continued to say that the movement of product into *daigou* channels was "overseen," "approved," and "activated" by Mr. Assa. FE-3 explained that "everything, absolutely everything" was approved by Mr. Assa and that he had influence over the process while occupying his role as President, Commercial Estée Lauder Travel Retail Worldwide. According to FE-3, Mr. Assa was also responsible for allocating product to the various regions and that *daigou* was taken into account when making these decisions. FE-3 explained that these allocation decisions even occurred while global pandemic lockdowns were in place, whereby travel retail shipments all went to China.

### B. <u>February 3, 2022 – Second Quarter 2022 Earnings Press Release</u>

173. Also on February 3, 2022, the Individual Defendants caused Lauder to file a Current Report on Form 8-K with the SEC for the 2Q22, for the period ended December 31, 2021 (the "2Q22 Earnings Press Release"). The 2Q22 Earnings Press Release stated that:

> ***Global travel retail sales increased double digits, reflecting continued growth from Asia/Pacific, despite ongoing travel restrictions there during much of the second quarter of fiscal 2022***. Net sales also grew from Europe, the Middle East

> & Africa and The Americas as the partial lifting of travel restrictions, specifically in the United Kingdom and the United States, increased traffic and supported the reopening of doors.

174. The Individual Defendants' above February 3, 2022 statements were materially false and misleading for the same reasons set forth in paragraphs 161-172. Specifically, the Individual Defendants' statements above in Lauder's 2Q22 Earnings Press Release were materially false and misleading because the Individual Defendants attributed 2Q22 travel retail sales increases to "continued growth from Asia/Pacific" when sales growth in Lauder's travel retail business were primarily driven by *daigou* gray market resale in China, an unsustainable practice that the Individual Defendants previously denied the Company was involved in.

### C. May 3, 2022 – Third Quarter 2022 Earnings Call

175. On May 3, 2022, the Individual Defendants caused the Company to hold an earnings conference call to discuss its financial results for 3Q22, for the period ended March 31, 2022 (the "3Q22 Earnings Call"). In response to an analyst's question regarding China, defendant Freda stated:

> But also, we have seen historically, that also the bounce-back can be a very strong, because when this restriction finish, people travel domestically very fast and very happily. And ***so the confidence into Hainan future is unchanged actually increased given the incredible development of the place*** and the confidence in online is very strong.

176. The Individual Defendants' above May 3, 2022 statements were materially false and misleading because the Individual Defendants projected "confidence" into an "unchanged" future in Hainan, despite knowing that the January 1, 2022 Chinese government and earlier retailer crackdowns on *daigou* activity significantly altered Lauder's ability to continue depending on gray market resale to drive its travel retail growth. Because the Company had become heavily dependent on the *daigou* gray market to generate sales growth within the travel retail segment, the Individual Defendants' statements omitted material information that the Company's net sales would decline

as a result of no longer being able to rely on this illegitimate *daigou* sales to drive sales growth following China's 2022 *daigou* crackdowns. Moreover, the Individual Defendants' statements on the 3Q22 Earnings Call were materially false and misleading because they attributed "increased" confidence in an "unchanged" future to "incredible development of the place [Hainan]," despite knowing that Lauder's sales in Hainan were primarily driven by *daigou* gray market resale, an unsustainable sales practice.

177. Numerous FE accounts in the Securities Complaint confirmed the manner in which the regulations in Hainan created a massive opportunity for Lauder to increase its market share and net sales figures through travel retail. FE-2 described travel retail as an area of Lauder's biggest growth, going "way back." FE-2 further explained that travel retail was one of Estée Lauder's "largest growth pillars" and part of its "key strategic initiatives." FE-3 explained that China and particularly Hainan were "huge markets." FE-1 recalled that there was a shift from South Korea to China in the Travel Retail space during 2020 when the new regulations increased purchasing limits in Hainan.

178. FE-2 indicated that there was a huge amount of pressure every quarter to deliver sales results, and that sometimes that pressure, and the demands management made on its staff, were unreasonable and uncomfortable. FE-2 reiterated that there was "huge pressure" to improve Lauder's top line through sales growth, which happened "very often," as Estée Lauder was positioned as a growth company. Additionally, FE-2 recalled that Lauder sometimes asked its brand teams to do what it could to including moving launches to be first to market, change promotional calendars or accelerate new distribution.

179. FE-1 continued to say that companies could control the *daigou* market by limiting the supply of goods provided to duty-free locations, but preferred to sell more product, which came

at the risk of "flooding the market." Similarly, FE-3 further explained that the movement of product into *daigou* channels was "activated" through retailers, such as China Duty Free Group and that Estée Lauder utilized "incentives" in order to facilitate that movement. FE-3 recalled products moving into these channels both through physical sales on the shop floor and via internet purchases. According to FE-1, practices during this period "overflooded" the market. FE-1 recalled that large purchases made during the pandemic, from 2020 through her tenure at Lauder, were "almost definitely" made by *daigou*. FE-1 remembered that the biggest issue during her tenure was "high" stock holdings of retailers in Hainan, China. FE-1 noted that this period was "very challenging for the business."

180. Additionally, FE-1 described Lauder as being "much looser" when it came to "loading" retailers with stock in comparison to its competitors, such as L'Oréal. FE-1 explained that Estée Lauder "took a lot of market share" during the pandemic and that this was "very telling" because *daigou* were the only people buying product at that time. FE-1 commented that while Estée Lauder's increased market share was "nice on paper," Lauder's gains in its market share came from *daigou* business. FE-1 continued to say that Estée Lauder is now seeing the "repercussions" from their reliance on *daigou* during this period. FE-1 described the data surrounding Estée Lauder's jump in market share as "very jarring."

181. FE-2 remarked that it was hard to reconcile the growth of travel retail in China with the lockdowns and lack of travel, stating that it did not make sense and that the growth was "counterintuitive." FE-2 explained that "things didn't make sense" and that she could not "square" certain things that she observed.

182. FE-2 elaborated that there was too much pressure on sales growth, and that she could not understand why some people at the Company – who did not appear to be nice or good

at their jobs – were able to survive and keep their positions at Lauder, for example in the supply chain. FE-2 figured that those people who did survive at Lauder must be "up to something," like using the gray market of *daigou* resellers, to enable the practice.

183. FE-3 stated that, that if there were issues with overstocks that Lauder would "bulk ship" to places like Korea, where it was known that a *daigou* market existed, to cover losses. According to FE-3, the Company would "switch on the *daigou* market if needed," including sending "popular" products into these channels. FE-3 explained that products were "held back" so that they could be sent into areas with an extensive *daigou* market during "crunch time" of the fiscal year. Further, FE-3 recalled promotions also being utilized to send product into these channels. Further, FE-3 recalled that there was an emphasis on sending stock to APAC, which left other regions short of product, despite having retailers asking and ready to sell product while APAC was still experiencing lockdowns. FE-3 added that "popular" product was frequently held back from Europe in order to send to APAC.

184. Similarly, FE-1 described instances where it was important that Lauder move products with upcoming expiration dates "out of warehouses and into the channels." In such instances, FE-1 stated that Lauder "pushed products as fast as they can."

185. Additionally, as detailed above, numerous FE accounts in the Securities Complaint confirmed that the manner in which *daigou* affected Lauder's sales growth was known internally at the highest levels of the Company. For example, FE-2 confirmed that Lauder's executive leadership knew about the *daigou* reselling practice. FE-2 confirmed that the Company and its leadership could see sales spikes which were attributed to *daigou* practices. FE- 2 confirmed that Lauder had "clear visibility" in its sales because the Company had very detailed sell-through and sales reporting information from its retail partners. FE-2 described that Lauder monitored this

data on a weekly and monthly basis and held monthly estimate meetings with senior chief financial officers for various regions, during which sales data was reviewed in detail by the retailer, brand, and key product lines.

186. FE-2 elaborated that that you could see sales spikes in key stores and/or key items that were out of sync with historic norms and it would make you question the sales spikes at certain stores, regions based on which items had spikes. FE-2 went on to say that it would then become clear that they were for *daigou* or "suitcase trade" and had correlations with activities or promotions in China. FE-2 also advised that Lauder's brands with the biggest business in China were the higher-priced, more prestige brands, such as Estée Lauder and La Mer.

187. Similarly, according to FE-3, there was a whole team involved in the process led by Mr. Assa. FE-3 explained that there was a team that was a part of travel retail APAC that specifically analyzed the *daigou* market. According to FE-3, there was a "huge" amount of people on the Commercial Team in Singapore, the head office for APAC, that reported into Global Travel Retail and whose responsibilities included analyzing the *daigou* market. Further, FE-3 explained that there was a "team" and a "structure in place" to analyze the *daigou* market, which included the employee who was "heading up Korea" that worked directly with Mr. Assa on this issue.

188. FE-3 continued to say that the movement of product into *daigou* channels was "overseen," "approved," and "activated" by Mr. Assa. FE-3 explained that "everything, absolutely everything" was approved by Mr. Assa and that he had influence over the process while occupying his role as President, Commercial Estée Lauder Travel Retail Worldwide. According to FE-3, Mr. Assa was also responsible for allocating product to the various regions and that *daigou* was taken into account when making these decisions. FE-3 explained that these allocation decisions even occurred while global pandemic lockdowns were in place, whereby travel retail shipments all went

to China.

### D. <u>June 2, 2022 – Bernstein Strategic Decisions Conference</u>

189. On June 2, 2022, defendant Freda spoke at the Bernstein Strategic Decisions conference, where he stated:

> Then I believe that one of the most important opportunities globally in beauty is the development of the Hainan duty-free space, which we believe is just the beginning of the journey.
>
> * * *
>
> And that's explained – by the way, ***the incredible results in travel retail*** during the COVID Western lockdowns [were] ***because Hainan was more than substituting the amount of travelers in airports around the world*** just because it was domestic travel duty-free in China. So huge opportunity, this will continue.

190. Defendant Freda's above June 2, 2022 statements were materially false and misleading for the same reasons set forth in paragraphs 161-172 and 176-188. Additionally, during this conference, an analyst asked defendant Freda questions about whether intermittent lockdowns affecting China in 2022 would impact the Company's participation in upcoming promotional events. As described above, defendant Freda's response touted Lauder's "incredible results in travel retail ***during the COVID Western lockdowns***."

191. However, earlier in the conference, defendant Freda specified what he referred to as "COVID Western lockdowns" by referencing travel restrictions "in the US, in Europe ***during 2020*** when there were COVID lockdowns also." Accordingly, defendant Freda's statement which touted Lauder's "incredible results in travel retail ***during the COVID Western lockdowns***" referred to travel retail sales during 2020 and was false and misleading because, at that time in 2020 Lauder's sales were attributable to *daigou* gray market sales and not legitimate foot traffic in Hainan. Therefore, defendant Freda's statement was materially false and misleading because it attributed Lauder's "incredible results in travel retail" to "Hainan more than substituting the

amount of travelers in airports around the world," when in fact, Lauder's travel retail growth generated through Hainan was not because of travelers in airports.

### E. <u>August 18, 2022 – Fourth Quarter 2022 Earnings Call</u>

192. On August 18, 2022, the Individual Defendants caused the Company to hold an earnings conference call to discuss Lauder's financial results for 4Q22, for the period ended June 30, 2022 (the "4Q22 Press Release"). When asked by an analyst about Lauder's underlying market share performance in China as supply returns to normal, defendant Freda responded:

> [W]e do expect for the full year, China to go back growing double digit. We expect strong recovery in Hainan in the second part, in the second semester of the fiscal year, for sure, a gradual recovery before. That's our assumption, which obviously is going to give us also results in market share.
>
> * * *
>
> We believe the Hainan -- despite the current lockdown, which is obviously painful in the short term, but is a super strong opportunity for the long term, ***the power of Hainan in the future remain[s] intact, and we have strong presence and market share in this operation***.

193. Defendant Freda's above June 2, 2022 statements on Lauder's 4Q22 Earnings Call were materially false and misleading for the same reasons set forth in paragraphs 161-172 and 176-188. Additionally, defendant Freda's remarks on the 4Q22 Earnings call failed to disclose the fact that the Company had previously been relying on *daigou* sales to boost sales but had subsequently lost that ability in describing its "strong presence" and "market share" in Hainan. Lauder's market share grew in Hainan as a result of its dependence on *daigou* gray market resale and was therefore premised on factors the Individual Defendants knew were not sustainable.

### F. <u>November 2, 2022 – First Quarter 2023 Earnings Press Release and First Partial Corrective Disclosure/Materialization of the Risk</u>

194. On November 2, 2022, the Individual Defendants caused Lauder to filed its 1Q23 8-K with the SEC for the period ended September 30, 2022 (the "1Q23 Earnings Press Release").

In the 1Q23 Earnings Press Release, the Individual Defendants reduced the Company's fiscal year outlook for 2023:

> For fiscal 2023, we are lowering our outlook primarily to reflect tighter inventory management in Asia travel retail, given reduced traffic as a result of COVID-19 restrictions, tightening of inventory by some retailers in the United States, and greater negative impact from the far-stronger U.S. dollar. ***We anticipate sequential acceleration to strong organic sales and adjusted EPS growth in the second half of our fiscal year as these pressures begin to abate***, momentum continues to build other areas of our business, and our ongoing investments in innovation and advertising drive growth. Our optimism in the long-term growth opportunities for our brands and for prestige beauty remains intact. Reflecting our confidence, today we raised our quarterly dividend.

195. The Individual Defendants delivered this statement in connection with their first partial corrective disclosure, when they lowered Lauder's financial outlook "primarily to reflect tighter inventory management in Asia travel retail." However, the Individual Defendants made false and misleading statements which misled stockholders regarding the temporary nature of the poor results. Defendant Freda's above November 2, 2022 statements in the 1Q23 Earnings Press Release were materially false and misleading for the same reasons set forth in paragraphs 161-172 and 176-188. Additionally, defendant Freda's statements of reassurances were materially false and misleading insofar as the Individual Defendants knew the Company's ability to rely on *daigou* to prop up sales in the Travel Retail segment would not "abate" and would, in fact, continue to impact the Company's sales. Moreover, the Individual Defendants' references to "strong organic sales" were belied by the fact that the Company had been—for many years—relying on *daigou* gray market resale, an unsustainable sales practice that was now formally outlawed by the Chinese government.

### G. February 2, 2023 – Second Quarter 2023 Earnings Call and Second <u>Partial Corrective Disclosure/Materialization of the Risk</u>

196. On February 2, 2023, the Individual Defendants caused Lauder to hold an earnings conference call to discuss Lauder's financial results for its second fiscal quarter of 2023 ended

December 31, 2022 (the "2Q23 Earnings Call"). On the 2Q23 Earnings Call, defendant Travis was asked about Lauder's supply chain management, specifically as it relates to China. Defendant Travis stated:

> We do expect that – we will – two things, one is ***inventory levels are still coming down in Hainan***. They are almost at the level that we would expect sales to accelerate. ***So yes, we should start to see an inventory build related to the shipments that we expect to see in Q4***.
>
> In Korea, again, the pace is a little bit more uncertain given the transitory nature of what's going on right now. So we do anticipate, as I mentioned in the prepared remarks, that we will start to see resumption of travel in Korea. And depending on the pace of that resumption, that will depend on the amount of shipments that we have in the quarter. But we have taken obviously an assumption there. ***We are sitting on a decent amount of inventory even in our own warehouses to supply the sales that we expect to see in the fourth quarter***.

197. The Individual Defendants delivered these statements in connection with their second partial corrective disclosure, when they again lowered the Company's outlook for fiscal 2023, citing inventory problems and problems in its travel retail markets. However, the Individual Defendants offered reassurances to stockholders through their false and misleading statements. Defendant Travis's above February 2, 2023 statements in the 2Q23 Earnings Press Release were materially false and misleading for the same reasons set forth in paragraphs 161-172 and 176-188.

### H. May 3, 2023 – Third Quarter 2023 Earnings Call and Third Partial Corrective Disclosure/Materialization of the Risk

198. The Individual Defendants' scheme was further revealed on May 3, 2023, when the Individual Defendants caused the Company to hold an earnings conference call to discuss Lauder's financial results for 3Q23, for the period ended March 31, 2023 (the "3Q23 Earnings Call"). On that date, the Individual Defendants announced a further reduction of fiscal year 2023 guidance because of the slow recovery in Asia travel retail markets.

199. However, the Individual Defendants continued to mislead stockholders regarding the Company's business prospects. For instance, defendant Freda claimed during the 3Q23

Earnings Call that:

> Our retail sales growth was even stronger than organic sales growth in many markets around the world, including China and the US. ***Encouragingly, retail sales performance is significantly ahead of organic sales results in Global travel retail, which gives us confidence that the challenges in travel retail are abated with time***.

200. On that same call, defendant Travis stated:

> I think the thing that gives us more comfort now on a more continuous steady progression of recovery is the fact that the COVID restrictions have been lifted. And so what ***we were experiencing before with our travel retail business is the volatility related to just some of the COVID restrictions and the flow of traffic in travel and people's comfort with travel, so that gives us more comfort that we're going to see a recovery.***

201. The Individual Defendants delivered these statements in connection with their third partial corrective disclosure, when they announced a further reduction of fiscal year 2023 guidance because of the slow recovery in Asia travel retail markets. However, defendant Freda again reassured stockholders that the decline in sales would be "abated with time" and defendant Travis reassured stockholders that Lauder was "going to see a recovery." The Individual Defendants' above May 3, 2023 statements in the 3Q23 Earnings Press Release were materially false and misleading for the same reasons set forth in paragraphs 161-172 and 176-188. Moreover, the Individual Defendants' statements were materially false and misleading insofar as they attribute "volatility" in Lauder's travel retail business to traffic flows, people's comfort with travel and COVID restrictions, while omitting the primary driver of travel retail volatility – *daigou* gray market crackdowns.

### I. August 18, 2023 – Fourth Quarter 2023 Earnings Call and Fourth <u>Partial Corrective Disclosure/Materialization of the Risk</u>

202. On August 18, 2023, the Individual Defendants caused Lauder to hold an earnings conference call to discuss its 4Q23 financial results, for the period ended June 30, 2022 (the "4Q23 Earnings Call"). Despite revealing the impact of *daigou* enforcement actions, defendant Travis

continued to mislead stockholders, stating:

> And ***we have no concerns whatsoever about travel retail growing with traveling consumers***. It's a timing issue for us right now. And so I just want to really underscore that. ***It's a pretty -- it's having a timing issue that's having a big short-term temporary impact for us***. But we are not concerned at all about what we have shared with you in the past in terms of our strategy to continue to grow travel retail globally and certainly in all of our markets in Asia.

203. Defendant Travis delivered this statement in connection with the Individual Defendants' fourth partial corrective disclosure, when they included a substantial decrease in sales stemming largely from the travel retail markets in China and South Korea. The Individual Defendants' above August 18, 2023 statements in Lauder's 4Q23 Earnings Call was materially false and misleading for the same reasons set forth in paragraphs 161-172 and 176-188. However, the Individual Defendants continued to mislead stockholders about the extent of the *daigou* problem. Specifically, the Individual Defendants' statements on Lauder's 4Q23 Earnings Call were materially false and misleading insofar as they cast China's severe government crackdowns on *daigou* activity as "a timing issue" with a "big short-term temporary impact." Far from "short-term headwinds," the "enforcement actions" to control *daigou* activity flowed from laws implemented by the Chinese government that put an end to Lauder's running spigot of high-volume gray market travel retail growth.

## VII. THE FULLY SUSTAINED SECURITIES ACTION

204. Based on these events, the Securities Action was initiated against the Company in December 2023. The operative Securities Complaint would later be filed on March 22, 2024 on behalf of investors who purchased or acquired Lauder shares during the Class Period. The allegations in the Securities Complaint were based in part on the detailed confidential witness accounts provided by the FEs. The Securities Complaint asserted federal securities fraud claims against the Company and defendants Freda and Travis.

205. Following the filing of the Securities Complaint, the defendants to the Securities Action moved to dismiss. On March 31, 2025, however, Judge Subramanian ***denied the defendants' motion to dismiss in its entirety***, notwithstanding the materially heightened pleading standards applicable in the Securities Action pursuant to the PSLRA.

206. In denying defendants' motion to dismiss, Judge Subramanian concluded that the nine sets of defendants' public representations challenged in the Securities Complaint (made on February 3, 2022, May 3, 2022, June 2, 2022, August 18, 2022, November 2, 2022, February 2, 2023, May 3, 2023, and August 18, 2023) contained "actionable statements", including "***misleading omissions***", and were "***mired in half-truths***." These are the very same statements challenged by Plaintiff herein.

207. In finding that the challenged public statements in the Securities Complaint were actionable, among other things, Judge Subramanian specifically credited the FE accounts and rejected the defendants' attempts to "discredit plaintiffs' allegations about three anonymous former employees." Further, Judge Subramanian concluded that the Securities Complaint sufficiently alleged scienter as to defendants Freda and Travis.

208. The Securities Action parties subsequently agreed in 2026 to a proposed ***$210 million*** settlement, which remains pending.

## VIII. DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

209. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

210. Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

211. On January 23, 2025, Plaintiff issued the Litigation Demand to the Board. *See* Ex. A. Therein, Plaintiff demanded that the Board undertake an independent, good faith investigation

and take action on behalf of the Company against the Individual Defendants (identified in the Litigation Demand as "Management") and hold such individuals to account for the damages their fiduciary failures caused Lauder and/or exposed Lauder to.

212. Shortly after Plaintiff issued the Litigation Demand to the Board, the Securities Action was sustained in its entirety. Subsequently, the parties to the Securities Action agreed to a proposed ***$210 million*** settlement.

213. In response to a pre-suit demand, directors of a Delaware corporation must ***promptly*** investigate and evaluate the charges to discharge their duties to shareholders and manage corporate affairs responsibly. The directors must conduct an objective and thorough investigation. Directors are fiduciaries, and thus they are duty-bound to inform themselves properly before making business decisions.

214. Indeed, where a shareholder makes a pre-suit demand under Delaware law, the only issue subject to challenge is the good faith and reasonableness of the board's investigation. Although there is no prescribed procedure that a board must follow, and directors need not show that they performed a perfect investigation, the process must be sufficient for a court to conclude confidently that it reflects an earnest attempt to investigate a shareholder's complaint. Business judgment protection does not apply where a board's "review" of a demand effectively constitutes a pretext or sham.

215. Further, claims for relief belonging to the Company are, of course, valuable corporate assets. Directors of Delaware corporations, such as Lauder, are duty-bound at all times to protect and preserve the corporation's assets.

216. For ***more than a year and a half*** since being served with the Litigation Demand, a period of time during which the Securities Action was sustained in its entirety notwithstanding

the materially heightened PSLRA pleading standards, leading to a proposed $210 million settlement of the Securities Action, the Board has failed to investigate at all, or has otherwise failed to complete an investigation and respond to the Litigation Demand.

217. The Board's failure to complete an investigation after more than a year and a half into the serious allegations of wrongdoing in the Litigation Demand – allegations which supported a complete denial of defendants' motion to dismiss in the Securities Action, leading to a proposed $210 million settlement – amounts to a constructive, wrongful refusal of the Litigation Demand and the failure to protect and preserve the Company's corporate assets, in violation of the Board's fiduciary duties to Lauder and its stockholders.

218. Accordingly, this derivative action should proceed.

**COUNT I**

**Against the Individual Defendants for Violations of §10b of the Exchange Act and Rule 10b-5**

219. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

220. The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

221. The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

222. The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of

material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

223. The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of Lauder were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

224. The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Lauder, their control over, and/or receipt and/or modification of Lauder's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Lauder, participated in the fraudulent scheme alleged herein.

225. As a result of the foregoing, the market price of Lauder common stock was artificially inflated. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of Lauder common stock in purchasing Lauder common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

226. In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm. The Individual Defendants, through their violation of

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, exposed the Company to damages associated with the Securities Action.

## COUNT II

### Against Defendants Freda and Travis for Contribution Under Sections 10(b) and 21D of the Exchange Act

227. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

228. Lauder, along with defendants Freda and Travis (the "Officer Defendants"), were named as defendants in the fully sustained Securities Action, which asserted claims under the federal securities laws for violations of Sections 10(b) and 21D of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

229. The Securities Action alleged that the class members relied, directly or indirectly, upon the false and misleading statements and omissions, as alleged herein, in purchasing Lauder securities. The Securities Action further alleged that, as a direct and proximate result, the class members suffered damages because the value of their investments were artificially inflated by the false and misleading statements and omissions, they purchased such securities at the artificially inflated prices, and the value of their investments fell when the truth was eventually revealed, causing economic losses to the class members.

230. The Securities Complaint was sustained in its entirety by this Court, notwithstanding the materially heightened pleading standards applicable pursuant to the PSLRA.

231. The Company is now a party to the proposed $210 million settlement of the Securities Action, in whole or in part due to the Officer Defendants' willful and/or reckless violations of their obligations as officers and/or directors of the Company.

232. The Officer Defendants, because of their positions of control and authority as

senior executive officers of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Action.

233. Accordingly, the Officer Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

234. As such, the Company is entitled to receive all appropriate contribution or indemnification from the Officer Defendants.

**COUNT III**

**Breach of Fiduciary Duty Against the Individual Defendants**

235. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

236. The Individual Defendants, as current or former Lauder officers and/or directors, owe (or owed) the Company the fiduciary duties of due care, loyalty, good faith, candor, oversight, reasonable inquiry, and supervision.

237. By virtue of their positions as Lauder directors and/or officers, these Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading statements alleged herein.

238. Each Individual Defendant was required to: (a) use his or her ability to control and manage Lauder in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of Lauder rather than his or her own interests.

239. By their acts alleged herein, including but not limited to causing Lauder to issue false and misleading statements while concealing material adverse information and failing to ensure that the Company maintained adequate internal controls regarding financial disclosures, the Individual Defendants each breached their fiduciary duties.

240. The Individual Defendants acted in bad faith, willfully, and/or recklessly in violating their fiduciary duties owed to the Company.

241. Lauder has been injured as a direct and proximate result of the Individual Defendants' wrongful conduct.

**COUNT IV**

**Against the Individual Defendants for Unjust Enrichment**

242. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

243. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Lauder.

244. Plaintiff, as a shareholder and representative of Lauder, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, salaries, benefits and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**COUNT V**

**Breach of Fiduciary Duty Against the Demand Defendants**

245. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

246. The Demand Defendants have acted unreasonably and in bad faith by failing for

***more than a year and a half*** to investigate, or otherwise complete an investigation, and respond to the Litigation Demand. In the interim, the Securities Complaint was fully sustained and the parties to the Securities Action reached agreement on a proposed $210 million settlement.

247. As a direct and proximate result of the breaches of duty alleged herein, Lauder has sustained and will sustain significant damages.

248. As a result of the misconduct alleged herein, the Demand Defendants are liable to the Company.

249. Plaintiff, on behalf of Lauder, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A. Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B. Directing Lauder to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders holders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

C. Awarding to Lauder restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Date: August 14, 2026

**THE ROSEN LAW FIRM, P.A.**

*<u>/s/ Phillip Kim</u>*
Phillip Kim
Erica L. Stone
275 Madison Avenue, 40th Floor
New York, NY 10016
(212) 686-1060
philkim@rosenlegal.com
estone@rosenlegal.com

**SHUMAN, GLENN & STECKER**
Rusty E. Glenn
600 17th Street, Suite 2800 South
Denver, CO 80202
(303) 861-3003
rusty@shumanlawfirm.com

**SHUMAN, GLENN & STECKER**
Brett D. Stecker
326 W. Lancaster Avenue
Ardmore, PA 19003
(303) 861-3003
brett@shumanlawfirm.com

*Counsel for Plaintiff Michael J. Muskopf*

**The Estée Lauder Companies Inc. Verification**

I, Michael J. Muskopf, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint (the "Complaint"), and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: 08 / 07 / 2026

Michael J. Muskopf

# Exhibit A

**SHUMAN, GLENN & STECKER**

Telephone: 303.861.3003
Facsimile: 303.536.7849
www.shumanlawfirm.com

*600 17th Street, Ste. 2800 South*
*Denver, CO 80202*

Philadelphia · San Francisco

January 23, 2025

**Via Federal Express**

William P. Lauder
Chairman of the Board of Directors
The Estée Lauder Companies Inc.
767 Fifth Avenue
New York, NY 10153

Re: ***Litigation Demand Pursuant to Delaware Law***

Dear Mr. Lauder:

I write on behalf of Michael J. Muskopf (the "Stockholder"), an owner of the common stock of The Estée Lauder Companies Inc., a Delaware corporation ("Lauder" or the "Company"),[1] to demand that the Company's Board of Directors (the "Board")[2] commence an independent investigation into potential wrongdoing by the members of Management.

Specifically, the Board must undertake an independent, good-faith investigation into whether the members of Management breached their fiduciary duties by issuing a series of knowing false and misleading statements to stockholders from February 2022 through October 2023 (the "Relevant Period"). These statements were designed to and (for a time) did conceal that: (i) under Management's direction, Lauder previously relied on a pervasive, prohibited gray market resale industry in China and South Korea called *daigou* to boost its travel retail sales, and (ii) severe crackdowns implemented at the start of 2022 by Chinese regulators drove a series of travel retail sales declines. Should the Board's investigation conclude that any members of Management breached their fiduciary duties, the Stockholder demands that the Board institute litigation against such individuals to recover the damages their misconduct has caused the Company.

---

[1] As used herein, the terms "Lauder" and the "Company" include all Lauder employees and directors, as well as all affiliates, joint ventures, and subsidiaries.

[2] According to the Company's website, the current Board of Directors (the "Board") consists of yourself, Charlene Barshefsky, Angela Wei Dong, Stephane de La Faverie, Paul J. Fribourg, Jennifer Hyman, Gary M. Lauder, Jane Lauder, Ronald S. Lauder, Arturo Nunez, Lynn Forester de Rothschild, Barry S. Sternlicht, Jennifer Tejada, and Richard F. Zannino. The current members of the Board, together with two former senior officers of the Company, Fabrizio Freda ("Mr. Freda") and Tracey T. Travis ("Ms. Travis"), are referred to herein as "Management."

As a result of the events which give rise to the Stockholder's demand, the Company is currently a defendant in a federal securities fraud class action pending in the U.S. District Court for the Southern District of New York, captioned *In re The Estée Lauder Companies Inc. Sec. Litig.,* Case No. 1:23-cv-10669-AS (the "Securities Action"). The operative complaint in the Securities Action was filed on March 22, 2024 (the "Securities Complaint") and is based in part on multiple detailed confidential witness accounts provided by former Company employees, which are referenced herein.

## I. <u>Overview of Management's Alleged Misconduct</u>

Lauder, a Delaware corporation headquartered in New York City, was founded in 1946 and is one of the world's leading manufacturers, marketers, and sellers of luxury skincare, makeup, fragrance, and haircare products. Lauder sells its products in approximately 150 countries and territories under several well-known brand names, including but not limited to: Estée Lauder, Clinique, Origins, M·A·C, Bobbi Brown, La Mer, Aveda, Jo Malone London, Too Faced, Dr.Jart+, and The Ordinary.

For years leading up to the start of the Relevant Period, Management assured stockholders that sales growth within Lauder's critical Asia travel retail segment was driven by sustainable underlying demand for Lauder's products and the strength of its brand. In truth, however, Lauder had been supplying and growing dependent on *daigou*[3] to drive sales within its Asia travel retail segment, an unsustainable practice which was concealed from stockholders. Critically, in 2019, Lauder publicly denied the use of *daigou* to inflate sales, citing Company policies and purchasing quotas at retail locations designed to "limit any risk of gray market around the world." Nevertheless, pressure on the Company to grow led it to become reliant on the *daigou* resale pipeline, as it pumped massive amounts of product into the gray market via its travel retail channels. Indeed, according to the accounts of multiple former employees in the Securities Complaint, Lauder used *daigou* to offload product during the COVID-19 pandemic while sales were slumping. For a time, surreptitious use of the *daigou* gray market had its intended effect, allowing Lauder to report surprisingly strong travel retail sales given a global pandemic.

The ability to rely on *daigou* to prop up sales figures, however, inevitably and abruptly came to an end. First, on July 1, 2021, the Company's largest customer, China Duty Free Group ("CDFG")—the top travel retailer in China, which generated ***14%*** of Lauder's net sales—pledged to eradicate all *daigou* activity. Then, on January 1, 2022, Chinese regulators implemented severe crackdowns on all *daigou* activity, effectively ending the ability to rely on the gray market as a revenue stream.

At the start of the Relevant Period, on February 3, 2022, Management misleadingly touted the Company's financial results for the second quarter of fiscal year 2022, which captured activity

---

[3] *Daigou* directly translates from its Chinese origin to English as "buy on behalf of". *Daigou* are resellers that purchase luxury goods at reduced, duty-free prices and resell them to end-consumers in mainland China at a price below retail but high enough to profit.

from October 1, 2021 to December 31, 2021 -- prior to China's *daigou* crackdowns taking effect. Management touted "***[n]et sales increased in [Lauder's] travel retail business . . . reflecting continued strength of [Lauder's] brands with the Chinese consumer***," which falsely attributed sales revenue generated from illicit and unsustainable *daigou* to the Company's brand strength. After the *daigou* crackdowns took effect, however, the Company's financial results rapidly declined, and Management made a series of misleading statements designed to convey a false picture of continued travel retail growth and demand. In doing so, Management concealed from stockholders the material effects the crackdowns had on Lauder's *daigou*-dependent travel retail business. For example, on May 3, 2022, the Company's then-President and Chief Executive Officer ("CEO"), Mr. Freda,[4] represented that Management's "***confidence into Hainan['s] future is unchanged, actually increased***," concealing that the actual source of Lauder's success in Hainan, China -- the epicenter of travel retail in China -- was *daigou* and that the Company's ability to generate the same level sales there had in fact changed negatively. As the Relevant Period progressed, in each quarter the Company began reporting incrementally worse financial results related to its travel retail segment.

Rather than disclose the real reason for these poor results, Management misleadingly reassured stockholders of the temporary nature of disruptions to Lauder's now flailing travel retail sales. For example, on November 2, 2022, while omitting any reference to the *daigou* crackdowns, Management reported declining sales figures, claiming any such softness in sales was simply a "***near-term temporary pause***" that did "***not diminish [Management's] deep conviction in Hainan for the long term***." Similarly, on May 3, 2023, Management again reassured stockholders that "***the challenges in travel retail are abated with time***." However, with the ability to rely on *daigou* sales gone for good and analysts asking about the reasons for the travel retail segment's inexplicably poor performance, Management was forced to finally admit on August 18, 2023 that "retail sales trends deteriorated and turned steeply negative following the enforcement actions to control *daigou* activity." Later, on November 1, 2023, Management acknowledged that the travel retail sales downturn was "***primarily***" caused by government and retailer crackdowns on "***unstructured***" gray market activity.

Stockholders and analysts were shocked. For example, on November 1, 2023, Jefferies Research ("Jefferies") reported that the Company's poor quarterly and full year financial outlook "both proved to be far worse than models" and that it now understood that the "*Daigou* portion was a meaningful part of the [travel retail business]." In response, Lauder's stock price fell by nearly ***50%*** over the course of several disclosures spanning a year, from $206.76 per share on November 1, 2022 to $104.51 per share by November 1, 2023. The Company's stock price has only continued to plummet since the end of the Relevant Period, and currently trades for only around $74 per share.

---

[4] Mr. Freda joined the Company in 2008 as President and Chief Operating Officer, and subsequently assumed the position of CEO in 2009. Mr. Freda served as President and CEO and as a member of the Board from 2009 until his retirement was announced in August 2024. Upon information and belief, Mr. Freda remains employed by the Company as a consultant.

**A. The Company's Asia Travel Retail Business**

As of January 2024, Lauder held a 13.6% share of the global beauty market, making it the second largest beauty company in the world. Prestige beauty is an extremely competitive business, in which discerning consumers drive sales. Accordingly, Lauder's commitment to preserving both its market position and public perception as a leader in the high-end prestige beauty space is crucial to its business. Lauder's commitment to its luxury brand image is clear from how the Company describes itself on its website: "We are Prestige Beauty. It's in our DNA."

The "channels" or venues through which Lauder distributes its products are critical to its sales and are meant to align with Lauder's luxury brand image and price point. As the Company's public filings with the U.S. Securities and Exchange Commission ("SEC") explain: "We sell our prestige products through distribution channels that complement the luxury image and prestige status of our brands . . . . We believe that our strategy of pursuing selective distribution heightens the aspirational quality of our brands." Accordingly, Lauder's traditional distribution channels include high-end department stores, upscale spas, and luxury e-commerce websites.

In recent years, travel retail has become one of Lauder's most important and profitable sales channels. Travel retail is comprised of duty-free shops, including those at airports or on cruise ships. Products sold in Lauder's travel retail channels are in high demand by international travelers because they are exempt from import and sales taxes. In 2021, travel retail accounted for 28% of Lauder's total revenue, a significant increase from 18% in 2018 and 6% in 2009. Indeed, by 2023, Mr. Freda touted that travel retail accounted for "nearly a third" of Lauder's overall business.

Lauder's travel retail channel is especially popular in certain Asian markets, notably China and South Korea. Lauder's website acknowledges that "Asian consumers are among the most discerning in the world -- which bodes well for the prestige beauty category." Lauder's appeal in Asia is also due to large international price differentials on certain beauty products, outsized demand for luxury beauty products in Asian countries, and limited availability of certain brands in different countries. When coupled with international tax exemption and a massive consumer base, Lauder's duty-free travel retail channels in China[5] and South Korea[6] have become a critical source of revenues for Lauder and were therefore closely watched by analysts and stockholders during the Relevant Period. For example, on February 6, 2023, analysts at Credit Suisse detailed their

---

[5] According to Lauder's Annual Report on SEC Form 10-K for the fiscal year ended June 30, 2023, filed on August 18, 2023 (the "2023 10-K"), "net sales in mainland China, as well as net sales from travel retail locations, in fiscal 2023, 2022 and 2021 were approximately 28%, 34% and 36% of consolidated net sales, respectively."

[6] Lauder's 2023 10-K states that in fiscal years 2022 and 2023 "net sales in Korea, including net sales from travel retail locations, were approximately 10% and 11% respectively, and no other country represented greater than 10% of the Company's consolidated net sales."

expectation that Lauder's "travel retail revenues are poised to step-change higher very quickly and will continue to be a significant driver for several quarters."

Management also highlighted the specific importance of Lauder's China travel retail segment in the Company's SEC Forms 10-K for fiscal years 2021 and 2022, which reported that the Company's single "largest customer . . . sells products primarily in China travel retail," and accounted for 14% of Lauder's consolidated net sales in 2021. Analysts determined that Lauder's "largest customer" during those periods was likely the world's number one travel retailer, CDFG.[7]

**B. Asia Travel Retail's Basement Exchange: China's *Daigou* Gray Market**

In China, growing travel retail channels gave rise to a backchannel gray market for luxury goods. Beginning around 2005, the clandestine gray market resale industry known as *daigou* emerged in certain Asian markets to serve end-consumers in mainland China. The *daigou* industry is a form of surrogate shopping whereby large quantities of goods are purchased, typically from duty-free stores in travel retail channels, and resold at a profit to end-consumers in local markets. The *daigou* gray market capitalizes on the scarcity and high import price of luxury goods in China, and profits from price arbitrage and tax exemptions unique to duty-free locations.[8]

Over the years, China has enacted regulations ensuring oversight of *daigou* entities. For example, on January 1, 2019, a new Chinese regulation took effect, called the E-Commerce Law of the People's Republic of China (the "ECL"). The ECL obligates *daigou* enterprises to register and pay taxes, a requirement specifically designed to remove *daigou*'s ability to profit from tax exemptions. This measure was part of the Chinese government's ongoing effort to curtail gray market activity.

*Daigou* thrives in locations where these enterprises can efficiently purchase large quantities of luxury items at a lower, duty-free price for resale in mainland China. As corporate *daigou* enterprises expanded their underground resale networks, certain locations in Asia became purchasing hubs. Internationally, South Korea is a common hotspot for the *daigou* industry because of its proximity to mainland China and relatively favorable luxury goods pricing and duty-free policies.

Domestically, the Chinese island province of Hainan sits just 12 miles from mainland China and became a haven for the *daigou* industry due to a highly favorable duty-free policy that

---

7 CDFG's parent company is China Tourism Group Duty Free Corporation Limited, a Chinese state-owned franchise company authorized by the State Council of China to carry out nationwide duty-free business in China.

8 Modern "corporate" *daigou* now have vast digital resources to reach their end-consumers and have largely displaced earlier, individualized operations. Corporate *daigou* can distribute massive amounts of luxury goods through the gray market pipeline.

allows tourists to purchase luxury goods at lower prices compared to the mainland.[9] Moreover, because up to 90% of Chinese citizens do not have a passport, domestic travel is particularly popular in China. Although purchases for *daigou* gray market resale can occur in any travel retail location, these two geographic locales became critical to the *daigou* industry's ability to bulk purchase duty-free luxury goods for resale on the gray market in mainland China.

However, luxury brands that funnel products through the *daigou* gray market expose themselves to significant financial, legal, and reputational risk for the singular purpose of driving near-term, voluminous sales. For this reason, the *daigou* market is universally condemned by prestige beauty brands (and their stockholders), who recognize these gray markets can damage a brand's image and impede the ability to generate above-board sales through legitimate retail channels. For example, in 2022 and 2023, luxury behemoth and Lauder competitor Louis Vuitton Moet & Hennessey SE publicly described *daigou* as "basement" exchanges that are "dreadful" for luxury companies, emphasizing that "there is nothing worse" for prestige brand equity.

### C. Lauder Floods *Daigou* With Product to Achieve Sales Growth While Stockholders Are Told the Company Never Benefits From the Gray Market

On February 5, 2019, Mr. Freda addressed industry questions about the impact of *daigou* and China's recently enacted ECL on Lauder's business during the Company's earnings conference call for the second quarter of 2019. Mr. Freda condemned the practice and denied the Company's reliance on gray market resale, assuring stockholders that Lauder was "***never benefiting from a lot of the daigou business because of [Lauder's] strict policies to avoid any phenomenon like this***." Mr. Freda also told stockholders Lauder would continue to enforce its internal purchasing quota policies in its travel retail channels "***to limit any risk of gray market around the world***." Contrary to Mr. Freda's public representations, massive amounts of product were diverted into the gray market resale pipeline to drive lagging sales. Indeed, Lauder became dependent on *daigou* to make its numbers during the COVID-19 pandemic, when international travel dramatically decreased.

By mid-2020, at the height of the pandemic, looser duty-free regulations implemented in China presented an opportunity for Lauder to drive sales through the *daigou* gray market. Specifically, on July 1, 2020, China's Hainan Island increased its duty-free spending limits. Purchasers in Hainan could now acquire up to $13,900.67 USD (100,000 RMB) worth of duty-free goods, causing *daigou* sales to proliferate. Lauder capitalized on these loosened regulations in Hainan by supplying massive shipments of products to its travel retail channels to generate sales through the *daigou* gray market. According to confidential witness accounts provided by former Lauder employees in the Securities Action, the Company became reliant on *daigou* to grow sales in its travel retail business. These accounts describe in detail how the Company's senior management drove travel retail growth through *daigou* gray market resale.

---

[9] Established in 2011, the Hainan Offshore Duty-Free Policy allowed tourists to purchase up to $4,170.20 USD (30,000 RMB) worth of duty-free luxury goods per person.

The confidential witness referred to as "FE-2" in the Securities Complaint described travel retail as an area of Lauder's biggest growth, going "way back."[10] Meanwhile, the confidential witness referred to in the Securities Complaint as "FE-3" explained that China and particularly Hainan were "huge markets."[11] And the confidential witness referred to in the Securities Complaint as "FE-1" recalled there was a shift from South Korea to China in the travel retail space during 2020, when new regulations increased purchasing limits in Hainan.[12] Additionally, per FE-2's account, Lauder sometimes asked its brand teams to move launches to be first to market, change promotional calendars, or accelerate new distribution. According to FE-1's account, large purchases made during the pandemic from 2020 through FE-1's tenure at the Company were "almost definitely" made by *daigou*.

The Securities Complaint alleges that according to FE-1, companies could control the *daigou* market by limiting the supply of goods provided to duty-free locations, but preferred to sell more product, which came at the risk of "flooding the market." Similarly, per FE-3's account, the

---

[10] The Securities Complaint states that FE-2 worked for Lauder for over 10 years, ending in mid-2021, and that prior to serving in FE-2's most recent role, FE-2 held the position of Senior Vice President in the finance part of the organization for one of Lauder's regions. This role allegedly included overseeing demand planning and store replenishment functions for Lauder. In this role, the Securities Complaint states that FE-2 attended monthly demand planning and financial review meetings for FE-2's region. From 2019 to 2021, FE-2 worked for Lauder on special projects to improve various aspects of Lauder's business planning capabilities, including supply chain, demand planning, and financial planning.

[11] The Securities Complaint states that FE-3 was employed by Lauder in a variety of roles for several years before the Relevant Period through early 2023, and most recently held a Senior Leadership position in Travel Retail EMEA (Europe, the Middle East, and Africa). FE-3 allegedly attended monthly meetings with the members of the EMEA leadership team, where the General Manager for the region provided information from another monthly meeting that occurred between Worldwide leadership attended by the Global President and regional general managers.

[12] The Securities Complaint states that FE-1 worked for Lauder from July 2022 to January 2023 as a Regional Marketing Director of Travel Retail for the Asia-Pacific ("APAC") region, La Mer | Le Labo. FE-1 is alleged to have worked closely with the General Manager for the Lauder brands for which FE-1 was responsible, La Mer and Le Labo. FE-1 also attended regular sales meetings, composed "action plans" for FE-1's department, and participated in monthly meetings with Lauder brand General Managers and Vice Presidents and Presidents of Travel Retail APAC, along with relevant employees from the sales and marketing teams. FE-1 was also responsible for managing the marketing calendar, which included budget management for new product launches, working closely with the commercial sales teams and demand planning and forecasting. Further, FE-1 was also responsible for promotions, some aspects of pricing, and public relations work. Prior to working for Lauder, FE-1 worked in travel retail APAC for FE-1's previous employer.

movement of product into *daigou* channels was "activated" through retailers such as CDFG, and Lauder utilized "incentives" to facilitate that movement. FE-1 described Lauder as being "much looser" when it came to "loading" retailers with stock in comparison to its competitors, such as L'Oréal. According to FE-1, Lauder "took a lot of market share" during the pandemic and this was "very telling" because *daigou* were the only people buying product at that time. FE-1 commented that while Lauder's increased market share was "nice on paper," gains in its market share came from *daigou* business. FE-1 continued to say Lauder is now seeing "repercussions" from reliance on *daigou* during this period. FE-1 described the data surrounding Lauder's jump in market share as "very jarring." And FE-2 remarked that it was hard to reconcile the growth of travel retail in China with lockdowns and lack of travel, stating that it did not make sense and growth was "counterintuitive."

Per FE-3's account in the Securities Action, if there were issues with overstocks Lauder would "bulk ship" to places like Korea, where it was known that a *daigou* market existed, to cover losses. According to FE-3, the Company would "switch on the *daigou* market if needed," including sending "popular" products into these channels. FE-3 added that "popular" product was frequently held back from Europe in order to send it to APAC.

Further, the confidential accounts in the Securities Complaint provided by former Lauder employees confirm it was known at the highest levels of the Company that product fed into Lauder's travel retail channels entered the *daigou* gray market. For example, according to the account of FE-2, Lauder's executive leadership team knew about the *daigou* reselling practice, and the Company and its leadership could see sales spikes attributed to *daigou* practices. Per FE-2's account, Lauder had "clear visibility" in its sales because it had very detailed sell-through and sales reporting information from its retail partners.

According to the Securities Complaint, FE-2 noted that Lauder held monthly and sometimes weekly demand planning meetings, which were "brutal" with abuse. FE-2 further noted there was plenty of information available at these meetings to "triangulate" the correct sources of the sales, including the impact of *daigou* or gray market sales. FE-2 decribed that "everyone" knew the price differentials based on the pricing database, which was updated fairly regularly, and that the tool used for the database was called Anaplan. FE-2 recalled there was a team of about 5-10 people working on it, and the head of that team became Chief of Staff for the Company's then-Chief Financial Officer ("CFO"), Ms. Travis.[13] According to FE-2's account, the database was used to track exchange rates and other differentials between brands and regions. This database, according to FE-2, was used to prepare slide decks and reports which were presented to senior executives, including Mr. Freda, who were briefed on these pricing differentials.

According to the account of FE-3, there was a whole team involved in the process led by Israel Assa ("Mr. Assa") the Company's Global President, Travel Retail. FE-3 explained there was a team that was a part of travel retail APAC that specifically analyzed the *daigou* market.

---

[13] Ms. Travis served as Executive Vice President and CFO of Lauder from 2012 until she announced her retirement in July 2024.

According to FE-3's account, there was a "huge" amount of people on the Commercial Team in Singapore, the head office for APAC, that reported into Global Travel Retail and whose responsibilities included analyzing the *daigou* market. Per FE-3's account, movement of product into *daigou* channels was "overseen," "approved," and "activated" by Mr. Assa. FE-3 explained that "everything, absolutely everything" was approved by Mr. Assa and he had influence over the process while occupying his prior role as President, Commercial Estée Lauder Travel Retail Worldwide. According to FE-3, Mr. Assa was also responsible for allocating product to the various regions, and *daigou* was taken into account in these decisions.

Importantly, it was known internally that Lauder products were being sold into the *daigou* gray market because a system was in place to track the final locations where its high-end products were sold. For example, according to the account of FE-2, "pincodes" were used for certain products to know if those products were going someplace they were not supposed to be. FE-2 further confirmed that if a product was pincoded, Lauder had the ability to see where it ended up. Similarly, FE-1 explained that all products had tracking codes to exercise "market control."

### D. China Cracked Down on *Daigou* and Management Concealed the Impact on the Company's Travel Retail Sales

As the COVID-19 pandemic abated, Chinese authorities began enacting policies to crack down on *daigou* due to the negative tax implications of the practice. Meanwhile, Lauder's travel retail sales remained inflated due to over-dependence on *daigou* gray market resale.

On July 1, 2021, travel retail titan and Lauder's largest customer, CDFG, publicly pledged to eradicate *daigou* gray market resale in Hainan. In making this announcement, CDFG stated that "it is necessary to maintain the healthy ecology of the offshore duty-free industry, severely cracking down on purchasing agents and preventing market risks."

Next, on December 7, 2021, the Chinese government publicly announced that regulations aimed at cracking down on *daigou* activity would take effect at the start of 2022. Chinese policy commentators quickly noted that "[t]he promulgation of this law shows the determination of the Hainan provincial government and the Chinese government to resolutely crack down on illegal *daigou* and smuggling."

Formal regulations enforcing this policy and cracking down on *daigou* took effect on January 1, 2022. By that time, Management knew Lauder could no longer depend on this unsustainable sales practice to drive sales growth, and that the critical travel retail business segment would be unable to maintain prior levels of *daigou*-inflated sales. Meanwhile, stockholders were kept in the dark as to the threat posed to Lauder's travel retail business because Management issued repeated public assurances that the Company condemned *daigou* and was not in the business of selling into the gray market.

**E. Management Publicly Attributed Travel Retail Sales Increases to Lauder's Brand Strength, Knowingly Concealing From Stockholders That *Daigou* Resale Was the True Driver**

Starting in February 2022, Management made a series of false and misleading statements to stockholders about the cause of Lauder's sales success in its Asia travel retail business. Specifically, on February 3, 2022, Management caused Lauder to report its financial results for the second fiscal quarter of 2022, which captured a three-month period from October 1, 2021 to December 31, 2021. The same day, Management caused Lauder to issue a press release and hold an earnings conference call with analysts and stockholders. Critically, the time frame reflected in the financial results disclosed on February 3, 2022 was prior to China's January 1, 2022 regulations cracking down on *daigou*, when Lauder was generating sales growth from and dependent on *daigou* gray market resale.

Management touted the Company's net sales increases in travel retail and misleadingly attributed the reported sales growth to sustainable, market-driven factors, such as the "strength" of Lauder's brand. In doing so, Management misled stockholders by failing to disclose that the Company had been relying on unsustainable sales practices -- namely, inundating the *daigou* gray market with product supply -- to drive sales growth. Specifically, Management boasted that "***[n]et sales increased in our travel retail business . . . reflecting continued strength of our brands with the Chinese consumer***." This statement led stockholders to believe Lauder's net sales increased in travel retail because its brand equity was strong with Chinese consumers, while concealing the reality that the net sales increase was due to *daigou*.

**F. Management Falsely Touted an "Unchanged" Landscape in Hainan, Despite China's Severe Regulatory Crackdowns on *Daigou* Taking Effect**

By the time Management reported the Company's financial results for the third fiscal quarter of 2022, China's government crackdowns on *daigou* activity had taken effect. On May 3, 2022, during an earnings conference call with analysts and stockholders, Management continued to state that "***confidence into Hainan['s] future is unchanged, actually increased***." However, this statement was false and misleading because Management represented an "***unchanged***" landscape in Hainan despite China's severe regulatory crackdowns on *daigou* having materially altered Lauder's ability to maintain its travel retail sales growth. Moreover, because the Company had become heavily dependent on the *daigou* gray market to generate sales growth within its travel retail segment, Management's statements omitted the material information that the Company could not sustain its sales figures, as a result of no longer being able to rely on this illegitimate backchannel to drive growth.[14]

---

[14] In 2022, late-stage COVID-19 variant surges caused episodic governmental lockdowns in parts of China, including Shanghai in February 2022 and Hainan in August 2022. Although these surges caused a wave of disruption, China's government lockdowns had the parallel effect of further obscuring the impact of the Hainan *daigou* crackdown on Lauder's travel retail business.

Likewise, on August 18, 2022, during an earnings conference call with analysts and stockholders in connection with the Company's financial results for the fourth fiscal quarter of 2022, Mr. Freda stated that "***the power of Hainan in the future remain[s] intact***." Mr. Freda's statement again gave stockholders the misleading impression of an unchanged market in Hainan, when in truth Lauder lost its ability to divert massive quantities of product to the *daigou* market to shore up its sales figures. However, as the Relevant Period progressed, Lauder could not stem the tide of the *daigou* regulatory crackdowns. Soon, Management's public statements touting the resilience of the travel retail business were spliced with disclosures revealing declining net sales.

**G. The Company's Stock Price Drops as Management Reveals Only Partial Truths Explaining Poor Sales, While Providing False Reassurances to Stockholders**

Eventually, Management was forced to begin revealing incrementally worse news of sales declines within Lauder's travel retail business and the negative impact it was having on the Company's financial outlook. Specifically, on November 2, 2022, Management caused the Company to issue a press release announcing its financial results for the first fiscal quarter of 2023. Therein, Management reduced the full year outlook for fiscal year 2023, which Management claimed was done "primarily to reflect tighter inventory management in Asia travel retail, given reduced traffic as a result of COVID-19 restrictions." In response, Lauder's stock price dropped by over 8%, a reduction of $16.80 per share, bringing the share price down to $189.96 at closing. Notwithstanding this disclosure, on November 2, 2022, Management reassured stockholders that Management "***anticipate[d] sequential acceleration . . . as these pressures begin to abate***." Management's reassurances were false and misleading because Management failed to disclose that Lauder was no longer unable to tap into the *daigou* gray market sales that accounted for its prior travel retail growth, and that such pressures were not going to abate with time.

As the Relevant Period continued, Lauder's stock price repeatedly dropped as Management revealed new information about the decline in travel retail sales. On February 2, 2023, Management again lowered the outlook for fiscal year 2023, due to the "disruption to travel and staffing levels in Hainan that slowed the expected normalization of inventory and the recently announced potential roll-back of COVID-related supportive measures in Korea duty free." In response to this news, shares of Lauder common stock declined by nearly 4.5%, a reduction of $12.39 per share, bringing the share price down to $268.41 on February 2, 2023. That same day, Management nonetheless continued to mislead stockholders, representing that the Company was "***sitting on a decent amount of inventory . . . to supply the sales that we expect to see in the fourth quarter***." However, these reassurances were materially false and misleading because Management's rosy picture of Lauder's inventory levels failed to disclose that Lauder could no longer rely on the *daigou* gray market to drive sales within its Asia travel retail segment.

---

Management's public statements amplified this obscurity, so as not to admit to the Company's dependence on *daigou* to prop up sales.

Then, on May 3, 2023, Management again lowered fiscal year 2023 guidance because of the slow recovery in Asia travel retail markets. Management noted that as "the shape of recovery from the pandemic for Asia travel retail comes into better focus, it is proving to be both far more volatile than we expected and more gradual relative to what we experienced in other regions." Management cited COVID-19 recovery and tightening inventory levels for the Company's poor financial results. As a result of these revelations, Lauder's common stock declined by over 17%, a reduction of $42.52 per share, bringing the share price down to $202.70 on May 3, 2023. Management again continued to reassure stockholders that sales would rebound despite knowing the *daigou* sales spigot had been turned off. For instance, Mr. Freda misleadingly claimed during Lauder's May 3, 2023 earnings conference call that: "[e]ncouragingly, retail sales performance is significantly ahead of organic sales results in Global travel retail, ***which gives us confidence that the challenges in travel retail are abated with time***."

At this point, analysts at Deutsche Bank expressed concern about Management lowering Lauder's guidance for the third consecutive time, stating: "the sheer magnitude of the reduced outlook and associated operating deleverage raises questions related to EL's capabilities vis-à-vis demand forecasting, visibility, and supply-chain agility in its most profitable geography and channel." Management's false and misleading narrative concerning Lauder's net sales decline in travel retail was becoming increasingly unbelievable as the truth emerged and the risk of Lauder's over-dependence on the *daigou* gray market materialized.

### H. Management Finally Admits That Over-Reliance on Daigou Was the Primary Driver of Lauder's Net Sales Decline in Travel Retail

On August 18, 2023, Management finally, explicitly admitted that the Company's travel retail "***sales trends deteriorated and turned steeply negative from the enforcement actions to control daigou activity***." In response, Lauder's common stock price would decline by nearly 7% over the next two trading days.

However, Management continued to mislead stockholders by failing to disclose that the loss of *daigou* sales were the primary cause of the Company's declining sales. Indeed, Management continued to reassure stockholders that any negative effects from *daigou*-related enforcement actions were merely "***short term headwinds***." Management also described the sales declines as a "***timing issue that's having a big short-term temporary impact for us***." These reassurances were false and misleading because Lauder depended on *daigou* gray market resale to generate travel retail growth for many quarters, which could not be maintained in the wake of China's 2022 crackdowns. Further, Management omitted the fact that the referenced "enforcement actions" were hardly isolated events, but rather reflected the Chinese government's 2022 regulatory enactment to eradicate *daigou* for good, as endorsed by Lauder's largest customer.

The full truth finally emerged on November 1, 2023, when Management admitted that Lauder's sales declines "primarily reflect a decline in our Asia travel retail business, ***primarily due to our and our retailers' actions to reset retailer inventory levels, and changes in government and retailer policies related to unstructured market activity***, that led to lower product shipments

compared to the prior-year period." This revealed to stockholders for the first time that the declining net sales Management had been attributing for over a year to other causes was "***primarily***" due to and reflective of government and retailer crackdowns on "***unstructured market activity***" -- *i.e.*, the *daigou* gray market. On this news, the price of Lauder common stock declined by $24.36 per share, or nearly 19%, to close at $104.51 on November 1, 2023. *The Daily Telegraph* soon thereafter published an article describing how Lauder's stock "plunged to a six year low," citing that "[t]he company blamed 'changes in government and retailer policies related to unstructured market activity,'" which was understood to be China's "clamp down on *daigou* resellers[.]" Similarly, on November 1, 2023, Jefferies reported that the Company's poor quarterly and full year financial outlook "both proved to be far worse than models" and it now understood based on Management's new disclosures that the "*Daigou* portion was a meaningful part of the [travel retail business]."

## I. The Securities Action

Based on the events and misconduct described above, Lauder investors filed the Securities Action against the Company in the Southern District of New York. Following the appointment of a lead plaintiff, the operative Securities Complaint was filed on March 22, 2024, based in part on the detailed confidential witness accounts referenced herein. The operative Securities Action complaint asserts claims against the Company, Mr. Freda, and Ms. Travis for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder and Section 20(a) of the Exchange Act in a systemic fraud via the Company's public SEC disclosures and other public statements. The Securities Action remains pending.

## II. Demand

In light of the above facts and events, the Stockholder hereby demands that the Board investigate independently and in good faith which current and former officers and directors of Lauder (including, but not limited to, those individuals identified herein as the members of Management) breached their fiduciary duties in connection with the events described herein, thus leading to the Company's substantial damages. The Board must further hold any such individuals to account for the damages their fiduciary failures caused the Company.

Failure to address the foregoing will only expose Lauder to additional liability and embarrassment. This letter is being sent so that, if derivative litigation on behalf of Lauder becomes necessary, the Board will have been given the first opportunity to commence the demanded litigation itself. Absent prompt action by the Board to obtain recovery of the Company's damages and prevent further damages, we intend to pursue legal redress on behalf of the Stockholder and the Company.

Sincerely,

SHUMAN, GLENN & STECKER

Rusty E. Glenn

cc: Brandon Lacoff, Esq.
Michael J. Muskopf